Samer M. SHADY, Appellant–
Respondent,

v.

Sheanin SHADY, Appellee–Petitioner.

No. 53A01–0605–CV–222.

Court of Appeals of Indiana.

Dec. 11, 2006.

Karen A. Wyle, Bloomington, IN, Attorney for Appellant.

Karl L. Mulvaney, Nana Quay–Smith, Kelly R. Eskew, Bingham McHale, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

On April 4, 2006, the trial court dissolved the marriage of Samer M. Shady (Samer) and Sheanin F. Shady (Sheanin),[1] awarded Sheanin physical and legal custody of A.S., awarded Samer supervised parenting time of A.S., and ordered Samer to pay $47 per week for child support. Samer now appeals, and presents the following restated issues for review:

(1) Did the trial court abuse its discretion by admitting certain evidence, qualifying Sheanin's witness as an expert, or relying upon Sheanin's expert's conclusions?

(2) Did the trial court abuse its discretion by failing to consider certain statutory factors?

(3) Were the trial court's findings and conclusions clearly erroneous?

(4) Did the trial court manifestly abuse its discretion in its parenting time order?

We affirm.

The issues presented are fact sensitive and, therefore, we will provide a detailed recitation of the facts viewed in a light most favorable to the ruling. Samer was born in Egypt on January 3, 1970, as an Egyptian citizen.[2] Sheanin is an American citizen. In 1994, Sheanin traveled to Egypt in order to study at The American University in Cairo. While in Egypt, Sheanin met Samer. Samer's father died in Egypt in July 1994. Shortly thereafter,

---

1. Sheanin is also referred to as "Sheanin McConnaughy," which is her pre-marital and post-dissolution name. *Appellant's Appendix* at 14.

2. We use the terms "national" and "citizen" interchangeably.

Sheanin and Samer married in a civil ceremony in Cairo, Egypt on October 9, 1994, and married in an Islamic ceremony a short time later. Following their marriage, Sheanin and Samer remained in Egypt until sometime in 1995, at which point they moved to Bloomington, Indiana. Sheanin and Samer lived with Sheanin's parents in Bloomington for the duration of their marriage.

Samer became a naturalized U.S. citizen on July 27, 2000. On January 28, 2001, A.S., Sheanin and Samer's only child, was born. On October 31, 2003, Sheanin filed a petition for dissolution of the marriage. Also in October 2003, Samer's brother moved from Egypt to Quincy, Massachusetts. On June 18, 2004, Sheanin filed a motion for an emergency order prohibiting Samer from adding A.S. to his Egyptian passport and removing A.S. from Monroe County, Indiana. Sheanin filed the motion because "[a]fter [Samer] was [n]aturalized he mentioned a number of times bringing [A.S.] overseas...." *Transcript* at 99. Further, Sheanin enrolled A.S. in the U.S. Department of State's passport watch program. Sheanin took these measures because she was concerned that if Samer took A.S. to Egypt, he would not allow A.S. to return to the U.S. On June 29, the trial court issued an order that prohibited Samer from both adding A.S. to his Egyptian passport and removing A.S. from Monroe County.

On September 27, 2004, the trial court issued an order directing Richard Lawlor, Ph.D., to conduct a custody evaluation. Dr. Lawlor submitted his evaluation on November 19, 2004, which revealed the following: Dr. Lawlor met with Sheanin,

Samer, A.S., Sheanin's parents, Larry and Hilda McConnaughy, and Sheanin's brother, Sheahan McConnaughy, on October 4, 2004. Dr. Lawlor interviewed Sheanin and Samer individually, Sheanin and A.S. together and Samer and A.S. together, and Larry, Hilda, and Sheahan. Dr. Lawlor administered the Minnesota Multiphasic Personality Inventory–2 (the MMPI–2) test to both Sheanin and Samer.[3] The MMPI–2 test results indicated, in relevant part, that:

Sheanin ha[d] two scales, Scales 1 and 2, out of normal range. [Dr. Lawlor did] not think this reflect[ed] any psychiatric diagnosis, but rather significant personality traits.

A 12/21 code type (two highest scales) is a pattern on the [MMPI–2] typically found in individuals who are anxious, tense and nervous. They tend to be high strung and to worry about many things.... They are ... also suspicious and untrusting. They ... harbor hostility toward people who are perceived as not offering enough attention or support. Sheanin [ ] present[ed] as below average in ability to deal with stress and frustration.... She also ha[d] a high average sense of social responsibility.

The psychological testing on *Sam[er]* ... present[ed] [that] ... he [ ] seem[ed] to be a person with a low sense of self-esteem or self-concept. He ha[d] all scales within normal range but one scale, Scale 6, approaching significance. His highest scale[s] [were] Scale 6 and Scales 4....

People with profiles where Scales 4 and 6 are the two highest scales tend to be

---

3. Dr. Lawlor's evaluation stated the MMPI–2 "is a comprehensive personality test [that] [ ] is useful in [child custody] cases on two levels. First, it is a good psychometric supplement to interviewing [subjects because one can] [ ] look[ ] at the mental health of the parties. On a second level this test [ ] sometimes give[s] useful information regarding personality states or traits that could have an effect on parenting." *Appellant's Appendix* at 41.

immature, narcissistic, and self[-]indulgent individuals.... They resent demands made of them.... Repressed hostility and anger are characteristics of people with this code type and they are often irritable, argumentative, and are described as "generally obnoxious." They resent authority. People with this pattern deny serious psychological problems and they rationalize and transfer blame for problems onto others. They do not accept responsibility for their own behaviors. They also tend to be somewhat unrealistic and grandiose in their self-appraisals. If a psychiatric diagnosis is warranted it is usually that of passive-aggressive personality disorder. ... [W]ithin the context of custody or visitation disputes[,] ... when the elevations are highest on these two scales there are typically problems of pride, willfulness, unreleased resentments and jealousy. Because of that there is potential for problems in the area of temper control as well as [ ] attempting to control others with threats of losing one [' ]s temper. Individuals with this pattern have an inability to forgive and forget and because of that are described often as trapped in the past. Insults to the person's public role, and hurts that have been inflicted, must be atoned for and compensated for. Even fairly normal range elevations on Scale 6 are problematic. They tend to denote rigidity or fixity of one's judgments. This often entails developing over-identifying alliances with a child or children but being severe when high parental standards and expectations are not met.

Sam[er] present[ed] as far below average in his ability to deal with stress and frustration and he tend[ed] to over[-]control hostility to an extreme degree. This pattern is consistent with the likelihood of passive-aggressive behaviors....

*SUMMARY AND CONCLUSIONS:* ... Sam[er] made the interesting observation ... of him not being [the kind of person] who [would] abduct[ ] children and go[ ] back to [another] country after a divorce.... However, ... [Dr. Lawlor thought] that [Samer] ha[d][the] potential for being th[at] type of person....

[A.S.] has an excellent relationship with both parents and ... it is important that she have as much contact as is possible with Sam[er]. However, ... whatever safeguards are recommended by the State Department, as well as by experts in this particular area of International Law, need to be put in place before [A.S.] is allowed to visit with her father outside of Monroe County.... [T]hese restrictions should stay in place at least until [A.S.] is old enough to understand what might be going on and would be able to resist on her own should there ever be an attempt to take her outside of the United States without the awareness of [Sheanin].

*Appellant's Appendix* at 49–51 (emphases in original). Dr. Lawlor also noted there were no allegations of serious domestic violence.

On December 13, 2004, Sheanin filed a "Motion for Order of Supervised Visitation and Notice of Engagement of Expert Witness in Risk Assessments in International Custody–Visitation Cases." *Id.* at 52. In this motion, citing Dr. Lawlor's evaluation, Sheanin renewed her request that the trial court limit Samer's access to A.S. to supervised visitations because of her ongoing fear that Samer would abduct A.S. and abscond to Egypt. Sheanin also notified the trial court that she retained Maureen Dabbagh, a purported expert in the field of international parental child abduction. The trial court, over Samer's objection, granted Sheanin's motion and ordered

Samer's visitations with A.S. to be supervised pending a final dissolution decree and parenting-time order.

On August 18, 2005, the trial court conducted a hearing in order to determine whether Dabbagh was an expert. Dabbagh's formal, post-secondary education consists of "two (2) years of [c]ommunity [c]ollege in the nursing field." *Transcript* at 24. Dabbagh has worked in international child abduction since 1994. During that time, she has worked with Interpol, the U.S. F.B.I., the U.S. Department of State's Office of Children's Issues, the U.S. Department of State's Diplomatic Security, various U.S. embassies and agencies, and the U.S. Department of Justice. Dabbagh has "also given presentations in the United Nations and Geneva upon invitation. [She has been] [p]art of panels and [C]ongressional testimony in Washington. [She was also] [a]sked to participate in ABA funded research on this topic." *Id.* at 25. Further, Dabbagh

> yearly ... attend[s] continuing education both [in the U.S.] and abroad on a wide variety of issues from chànges in international law to psychiatr[y] or ... alienation issues. [She] just finished up one [continuing education course in] DNA forensics.... It's like ten (10) years of this and it's the only way you can get a formal education that's documented in th[e] field [of international child abduction].

*Id.* at 24. The training Dabbagh has received, however, "has solely been in regard to international child abduction recovery." *Id.* at 39

Dabbagh has been involved in over 400 cases of international child abduction. She is the founder and president of "P.A.R.E.N.T.," an "international parent advocacy group.... [It is] the first and largest international coalition of agencies that lends support resources and information to parents and professionals as well as law enforcement issues regarding international child abduction." *Id.* at 30, 31. Although Dabbagh's training has been solely in recovery of abducted children, she also provides risk assessments in custody disputes. At the conclusion of the hearing, the trial court certified Dabbagh as an expert on international child abduction.

The trial court conducted hearings on November 17, 2005 and February 3, 2006. Sheanin and Samer agreed on property division and that Sheanin would have primary physical custody of A.S. The relevant remaining issues decided at the hearing were legal custody of A.S. and parenting time. In this regard, Sheanin's, Samer's, and Dabbagh's testimonies primarily addressed whether Samer was still a dual American–Egyptian citizen, the requirements of renouncing one's Egyptian citizenship, A.S.'s citizenship status, the effect of Samer's citizenship status upon A.S.'s citizenship status, ABA risk profiles used to assess whether one poses a potential risk of abducting his child, and whether Samer posed a risk to abduct A.S. The following is a summation of the testimony and documentary evidence adduced at the hearing.

Samer was a reservist in the Egyptian Army, but never served on active duty. Samer is no longer subject to prescriptive military service in Egypt by virtue of his age. Samer attempted to renounce his Egyptian citizenship by submitting his Egyptian birth certificate and passport to the Egyptian consulate. Samer's understanding of Egyptian law was that the Egyptian Minister of the Interior possessed the authority to validly abolish his Egyptian citizenship. In support of his contention that he validly renounced his Egyptian citizenship, Samer submitted a photocopied letter addressed to "The General/Assistant Minister of Interior De-

partment of Passport, Immigration, and Nationality," translated from Arabic into English, which bore an indiscernible seal, that stated Samer submitted a request to renounce his Egyptian citizenship. *The Exhibits* at Exhibit B.[4] Samer also submitted a second photocopied letter to "The Consulate General of Arab Republic of Egypt in New York," also translated from Arabic to English, which did not possess a seal of the Egyptian government or any of its agencies, that stated the Egyptian Ministry of the Interior recognized him as a citizen of the U.S. and no longer recognized him as a citizen of the Arab Republic of Egypt. *Id.*

Dabbagh testified that A.S. automatically received Egyptian citizenship because she is the biological child of a male Egyptian national, despite being born in the U.S. Dabbagh testified that A.S. does not need a passport to travel with Samer to Egypt because she can "piggy-back[ ]" onto his passport. *Transcript* at 326. Dabbagh further stated, "[A.S.] continues to be an Egyptian Citizen and entitled to an Egyptian passport regardless of [Samer's] nationality. In other words, [A.S.] still has access to an Egyptian passport. [A.S.] will still enjoy the privileges ... of being an Egyptian [c]itizen because she [wa]s not the one renouncing her citizenship." *Id.* at 336. Dabbagh testified that even if an Egyptian national renounces his citizenship and his renunciation is authorized by a presidential decree, the Egyptian national may renew his citizenship. "You just go ask for it.... [A]ctually it's very easy to get back." *Id.* at 338.

Dabbagh then addressed her assessment of the risk that Samer would abduct A.S. and abscond to Egypt. Dabbagh testified that "because of Doctor Lawlor's report

[Dabbagh] was able to take [Dr. Lawlor's] observations and his diagnosis and compare them with findings from the ABA research on psychological components. And that's where the [ ] ABA research has shown that parental abduction is motivated by revenge and control." *Id.* at 353. Dabbagh testified that Exhibit B was an official request by Samer to renounce his citizenship, but that there was no demarcation on the papers, *i.e.*, a presidential seal, that indicated it constituted an officially recognized renunciation. Dabbagh further stated that "research shows that if a child is young and vulnerable sometimes their [sic] even older and vulnerable, that they don't rebel against that authority or don't have the skill[s] to say [" ]no I don't want to go [" ] and ... stop the process [of abduction]." *Id.* at 356.

Dabbagh identified the following risks based upon the ABA risk factors for international child abduction: (1) "if the child was taken, the more difficult it is to get a child back the greater the risk[,]" *id.* at 357; (2) "[t]he minor child in this case is young and vulnerable [to] influence[ ] ... [,]" *id.*; (3) Samer "does have a support system in place in Egypt [that] would allow him to abduct[,]" *id.*; (4) Samer has significant family connections in Egypt; (5) this is a "bi-cultural marriage that has dissolved. That in and of itself is not a risk[.][H]owever, if that element exists and then underneath that you have a number of specific risk factors then you have that particular profile in play for abduction[,]" *id.* at 358; (6) marital instability; (7) lack of parental cooperation; and (8)

[d]isenfranchisement. [Samer] is disenfranchised from a legal system here in the United States that offers him what the legal system offers him in Egypt.

---

4. Samer did not paginate *The Exhibits*. Thus, we refer to exhibits by their trial-marked label.

In the United States we do not have a legal system that has a set of laws different for a male then [sic] ... for a female.... [I]n our judicial system we apply the law equally regardless of ... gender ... or religion. Whereas in Egypt ... there [are] different laws for Christians, there is a different law for Shiites, ... there is a different law for females and there is a different law for males. In [Samer]'s situation he would have the advantage in an Islamic Court [in Egypt] by virtue of ... his gender.

*Id.* at 358–59. With regard to Samer's "significant connections," Dabbagh stated:

[w]hen we're looking at significant connections often times we will look in cases where a dual national or an individual has lived in one place and grown up and then transferred to another place[.][ ][W]e look ... to determine where [one's] significant connections are. So we look at the demographics and we look at the history of both places. So if [Samer] hasn't invested here, in other words, ... he didn't go to school here, he doesn't own real estate here, he doesn't have a business here, and we're looking at the things that make a person a permanent part of the community. We then look at the other place, you know, well what w[ere] the significant connections there also? So we ... look at job history.... [H]ave they been at the same job for twenty-five (25) years? Are they vested? ... [I]s it an existence where they can just pick up and leave[?] ... [S]o we look at all these different things and in this particular case I was able to identify the fact that there was no regular job status or property owned or no business owned or ... enroll[ment] in school[.] ... [T]here doesn't seem to be any permanency.

*Id.* at 364.

Dabbagh also testified about The Hague Convention On The Civil Aspects of International Child Abduction. The U.S. is a signatory to this convention, but Egypt is not. Pursuant to this convention, signatory countries agree to extradite abducted children back to the country from which they were abducted when certain conditions are met. Dabbagh testified that

[i]n situations where a child is a dual national and the risk [of abduction] is to a Non–Hague country[,] the specific problem[ ] ... is that there really aren't any real effective safeguards except supervised visitation. Things like passport controls or putting up civil bonds ... can work in other types of risk cases[,] but unfortunately ... they literally are not effective in these types [of cases] and the ABA has recommended supervised visitation and that was my recommendation.

*Id.* at 366.

Based upon her understanding of international law, Egyptian law, her experience in abduction cases, and her analysis pursuant to the ABA risk profiles of the risk that Samer would abduct A.S., "Dabbagh identified risks [and] added those up and there were a few [ ] that fell into the grave risk and when [Dabbagh] added them up on the ABA recommendations it said, you know, this is grave risk category." *Id.* at 366. Dabbagh concluded, "[t]he majority of the kids that [she] go[es] after or the cases that [she] get[s] of abduction, the children were taken during visitation[,]" *id.* at 367, and "children abducted or retained in Egypt usually never see their other parent again." *Id.* at 363.

On April 4, 2006, the trial court issued its findings of fact and conclusions of law in which it stated, in relevant part:

7. Sheanin fears that Samer will abduct [A.S.] Samer has threatened, on multiple occasions, to take [A.S.] to Egypt and not to return the child to

[Sheanin]. Sheanin is asking that parenting time between Samer and [A.S.] be supervised until [A.S.] is old enough to actively resist any attempt to remove her from the [U.S.]

8. In analyzing [Sheanin's] request, the [trial] [c]ourt must consider: (1) the risk of abduction; (2) the obstacles to locating and recovering [A.S.] if an abduction were to occur; and (3) the potential harm [A.S.] would likely suffer if abducted.

9. In *Jurisdiction in Child Custody and Abduction Cases: A Judge's Guide to the UCCJA, PKPA, and the Hague Child Abduction Convention,* the American Bar Association notes six "risk profiles" for child abduction. While these profiles must be used with caution as a predictive device, two clearly have application to the case at bar:

a. **Profile 1. When there has been a prior threat of or actual abduction.** As set forth above, Samer has threatened to remove [A.S.] to Egypt.

b. **Profile 5. When one or both parents are foreigners ending a mixed-culture marriage.** "Parents who are citizens of another country (or who have dual citizenship with the U.S.) and also have strong ties to their extended family in their country of origin have long been recognized as abduction risks...." Often in reaction to being rendered helpless, or to the insult of feeling rejected and discarded by the ex-spouse, a parent may try to take unilateral action by returning with the child to [his] family of origin. This is a way of insisting that [his] cultural identity b[e] given preeminent status in the child's upbringing.

Although Samer's mother and father are deceased, he has substantial ties to his brother, who is an Egyptian national living in the United States. He also has extended family in Egypt.

\* \* \*

10. The Hague Convention on the Civil Aspects of International Child Abduction is an international treaty that governs the return of children from member nations. Significantly, Egypt is not a signatory to the Hague Convention. Consequently, there is no standard legal or diplomatic mechanism for securing [A.S.]'s return should Samer remove her to Egypt. Once [A.S.] is in Egypt, her relationship with her mother would be governed by Islamic law. Islamic law does not recognize a civil divorce granted to a female. After the issuance of this Decree of Dissolution, Sheanin will remain, in the eyes of the Egyptian authorities, the wife of Samer. In Egypt, he will maintain absolute control over her ability to see her child, or even to leave the country once she enters. [A.S.] could not leave the country without his permission until she is 21. Effectively, if Samer follows through on his threats to remove the child to Egypt, all future contact between [A.S.] and her mother will cease.

11. The government of Egypt considers all children born to Egyptian fathers to be citizens of Egypt. Thus, [A.S.] is a dual citizen of the United States and Egypt. [A.S.] may travel on her father's passport, as long as he provides proof that he is her father. She may also travel on the passport of a male relative. (Samer's brother is an Egyptian citizen.) During an unsupervised visit, it would not be difficult to remove [A.S.] to Egypt.

12. Samer has attempted to renounce his Egyptian citizenship. He state[d] that his passport has been destroyed. However, Egypt does not recognize this renunciation. Absent a specific order by the Egyptian President, [Samer] remains free to obtain a new Egyptian passport.

13. [A.S.] is only 5 years of age. She could not be expected to take action to prevent her forced removal to Egypt.

14. Removal to Egypt would be devastating for [A.S.] As has been stated, she would be separated, perhaps permanently, from her mother and her mother's family. Her mother has been her primary caregiver for the first five years of [A.S.]'s life. Additionally, [A.S.] would be placed in a culture that is substantially different from that which she has known. The legal rights and cultural expectations for women in the United States differ markedly from those of women in Egyptian society. It is clear that [A.S.] would face a tremendous adjustment that she would be forced to endure without [Sheanin]'s aid. Samer

[ ] has not visited regularly with [A.S.], and could not be expected to fill the void left by the absence of [Sheanin].

15. Having considered: (1) the risk of abduction; (2) the potential harm [A.S.] would likely suffer if abducted; and (3) the obstacles to locating and recovering [A.S.] if an abduction were to occur, the [trial] [c]ourt finds that deviation from the Indiana Parenting Time Guidelines is warranted, and strict prevent[a]tive measures are needed to insure the well-being of [A.S.] Visits between Samer and [A.S.] must be supervised.

*Appellant's Appendix* at 12–14. Samer now appeals. Additional facts will be included as necessary.

1.

■■■ Samer contends the trial court abused its discretion by allowing the ABA risk profiles to be used as evidence.[5] We understand Samer's argument to be that the trial court abused its discretion by admitting Sheanin's Exhibit 13, the ABA's *Jurisdiction in Child Custody and Abduction Cases: A Judge's Guide to the UC-*

---

**5.** In his appellate brief, Samer seems to argue the trial court abused its discretion by admitting Petitioner's Exhibit 13, the ABA's *Jurisdiction in Child Custody and Abduction Cases: A Judge's Guide to the UCCJA, PKPA, and the Hague Child Abduction Convention,* which contained the ABA Risk Profiles. In his reply brief, however, Samer states that "[Sheanin's] brief asserts that [Samer] is appealing [the] admission of the ABA Judge's Guide (Mother's Exhibit 13).... In fact, [Samer] is appealing the admission of the ABA Risk Profiles as part of Dabbagh's report and testimony, and any reliance thereon by the trial court." *Appellant's Reply Brief* at 7. We note that Dabbagh's report, Petitioner's Exhibit 17, was admitted without objection. Samer's claim that the trial court abused its discretion by admitting Petitioner's Exhibit 17, therefore, is waived. *Cf. Willey v. State,* 712 N.E.2d 434 (Ind.1999) (defendant's claim not waived on appeal even though no objection was made at trial because he asserted the

admission of evidence constituted fundamental error). Further, the "ABA Risk Profiles" appear in the appellate record only as part of the "ABA Judge's Guide" and as referenced in Dabbagh's report regarding her assessment of the risk that Samer would abduct A.S. Samer separately included in the appellate record neither the "ABA Risk Profiles" nor the document in which it was first published, Linda K. Girdner & Janet R. Johnston, *Early Identification of Parents At Risk For Custody Violations and Prevention of Child Abductions,* 36 Family Ct. Rev. 392 (1998). Samer, therefore, has provided an insufficient basis upon which to review his claimed error. *Davidson v. State,* 825 N.E.2d 414, 417 (Ind.Ct.App. 2005), *trans. granted,* 849 N.E.2d 591 (Ind. 2006), *rev'd on other grounds.* In light of this omission, we are unable to discern how Samer would have us conduct a review of the "ABA Risk Profiles" apart from their inclusion in Petitioner's Exhibit 13, *i.e.,* the "ABA Judge's Guide."

*CJA, PKPA, and the Hague Child Abduction Convention,* because Sheanin "offered almost no evidence, from her expert witness or otherwise, as to the methodology used by the ABA in the research that produced the 'risk profiles'." *Appellant's Brief* at 15. After Sheanin offered Petitioner's Exhibit 13, the following exchange occurred:

> **The Court:** ... Do you object to "13", exhibit number "13"? ...
>
> * * *
>
> **Thomas McDonald:** No....
>
> **The Court:** Okay. Then I will show "13" ... admitted without objection.

*Transcript* at 323. In order to preserve for review a claim that the trial court erroneously admitted evidence, a specific and timely objection must be made. *Tate v. State,* 835 N.E.2d 499 (Ind.Ct.App.2005), *trans. denied.* In the absence of a specific and timely objection, a claim regarding the admission of evidence is not available on appeal unless it constituted fundamental error. *Troxell v. State,* 778 N.E.2d 811 (Ind.2002). Nowhere in his brief does Samer claim the admission of this evidence constituted fundamental error. His claim, therefore, is waived. *Cf. Willey v. State,* 712 N.E.2d 434 (defendant's claim not waived on appeal even though no objection was made at trial because he asserted the admission of evidence constituted fundamental error).

 Samer further contends "[t]o the extent the trial court relied on [Dabbagh's] assessment of [Samer] as a potential abductor, that reliance was [ ] erroneous...." *Appellant's Brief* at 16. Within the context of Samer's argument, we take this to mean that the trial court abused its discretion when it relied upon Dabbagh as an expert witness. Under Ind. Evidence Rule 702(a), a witness may be qualified as an expert by virtue of her "knowledge, skill, experience, training, or education...." Only one of the enumerated characteristics is necessary to qualify an individual as an expert. *Hobson v. State,* 795 N.E.2d 1118 (Ind.Ct.App.2003), *trans. denied.* A witness may qualify as an expert, therefore, on the basis of her practical experience alone. *Id.* It is within the trial court's sound discretion to determine whether a person qualifies as an expert witness. *Id.*

Sheanin attempted to, and the trial court did, certify Dabbagh as an expert on the subject of international child abduction, to which Samer objected. Samer's primary objection to the trial court's decision to allow Dabbagh to testify as an expert witness was her lack of formal education. Dabbagh attended only two years of postsecondary school, in which she studied nursing. Ending the inquiry into Dabbagh's qualifications as an expert in international child abduction there would grossly understate her involvement in the field.

Dabbagh is the proprietor of Dabbagh & Associates, a consulting firm that provides services for clients interested in the recovery of abducted children and the assessment of the risk of future abduction. By her estimates, Dabbagh has worked on in excess of four-hundred such cases. Dabbagh has testified before the U.S. Congress, Committee on Government Reform, and is the founder and president of P.A.R.E.N.T. International, a non-profit organization involved in international parental child abduction. Dabbagh has testified as an expert on international child abduction in cases in Arkansas, California, Idaho, Illinois, Kansas, Maryland, Michigan, New Hampshire, New Jersey, Ohio, Tennessee, and Texas. Dabbagh is a board member with the Missing Children's Investigation Center, was a faculty member at the 13th annual Children's Rights Council International Conference in Wash-

ington, D.C., and is a board member with SOS France, a French Justice Department-funded non-governmental organization that works in the field of international child abduction. Additionally, Dabbagh has authored, contributed to, and presented papers on international child abduction.

Dabbagh clearly qualifies as an expert on international child abduction because of her knowledge, training, and practical experience. The trial court, therefore, did not abuse its discretion by qualifying her as an expert witness. *See Hobson v. State,* 795 N.E.2d at 1123 ("[the expert's] testimony shows that he had practical experience in shooting firearms, and that factor alone is sufficient to qualify him as an expert under [Evidence] Rule 702").[6]

■ Samer also contends the trial court abused its discretion by relying upon Dabbagh's conclusions because "those conclusions ... were ... based on crucially incomplete information." *Appellant's Brief* at 20. We first observe that Samer has failed to cite any legal authority in support of his argument. Further, as Samer notes, "[t]he trial court's findings did not explicitly refer to Dabbagh...." *Id.* Samer's argument is essentially a challenge to the weight to be given, not the admissibility of, Dabbagh's testimony regarding the risk that Samer would abduct A.S. Upon appeal, however, we do not reweigh the evidence. *Cf. Green v. Green,* 843 N.E.2d 23, 26 (Ind.Ct.App.2006) ("[w]hen reviewing a trial court's determination to modify custody, we may not reweigh the evidence or judge the credibility of the witnesses"). Thus, we decline Samer's invitation to re-evaluate the weight to be given Dabbagh's conclusions.

**2.**

■ Samer contends the trial court abused its discretion in its parenting time determination by failing to consider certain statutory factors in Ind.Code Ann. § 31–17–2–8 (West, PREMISE through 2006 2nd Regular Sess.). Samer states "I.C. 31–17–2–8 sets forth those factors the trial court must consider before entering an order determining custody *and visitation*[12]." *Appellant's Brief* at 21 (emphasis supplied, footnote in original). Samer's argument fails in several respects.

Initially, we observe that I.C. § 31–17–2–8 is entitled "Custody order." Contrary to Samer's characterization of I.C. § 31–17–2–8, that statute sets forth only the factors that a trial court must consider in making a *custody* determination, and states, in relevant part, "[t]he [trial] court shall determine custody and enter a custody order in accordance with the best interests of the child." Samer asserts that "[f]ailure to consider any of these factors constitutes an abuse of discretion." *Appellant's Brief* at 21 (citing *Green v. Green,* 843 N.E.2d 23). *Green,* however, does not involve a parenting-time or visitation order, but merely a review of a petition to modify a custody order. In further support of his argument that a trial court is required to consider the factors set forth in the custody statute in making a parenting-time determination, Samer states:

> I.C. 31–17–2–8 refers specifically to "custody orders". However, custody and visitation are interrelated, particularly at the time of the initial dissolution decree determining both. See, e.g., *Taylor v. Buehler,* 694 N.E.2d 1156,

---

**6.** Samer asserts Dabbagh did not qualify as an expert under Evidence R. 702(b), which states, "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert

testimony rests are reliable." Contrary to Samer's assertion, Dabbagh was not a "scientific expert," nor was the subject matter of her testimony "scientific."

1160 (Ind.Ct.App.1998)[, *trans. denied]*, describing the predecessor statute's list of factors as "the factors [that] must have been considered with regard to the initial custody-visitation determination." See also *In re Banning*, 541 N.E.2d 283, 284[ ] fn. 2 (Ind.Ct.App.1989); *Pence v. Pence*, 667 N.E.2d 798, 801 (Ind.Ct.App. 1996).

*Appellant's Brief* at 21 n.12. Samer's reliance upon *Taylor, Banning,* and *Pence,* however, is misplaced.

*Taylor* involved a review of a trial court's order modifying parental visitation. In that case, we discussed the differing standards for modifying a visitation order under I.C. §§ 31-1-11.5-24(b) *(repealed by* Public Law 1-1997, Sec. 157) and 31-6-6.1-12(b) *(repealed by* Public Law 1-1997, Sec. 157). As the citations indicate, those statutes no longer govern a trial court's parenting-time determination. *Taylor,* therefore, is inapposite, as is *Banning.* Samer relies upon our discussion in *In re Banning,* in which we stated:

> the Indiana Supreme Court, in *State ex rel. Jemiolo v. LaPorte Circuit Court,* [442 N.E.2d 1060, 1062 (Ind.1982)], stated that:
>
>> Although visitation rights and custody rights are not synonymous I.C. 31-1-11.5-24, they are sufficiently interrelated, [sic] *In re Marriage of Ginsberg,* [425 N.E.2d 656, 659 (Ind.Ct. App.1981)], that a petition to determine visitation rights filed after a determination of custody is in the nature of proceedings supplemental. See *State ex rel Greebel v. Endsley,* [269 Ind. 174, 379 N.E.2d 440, 441 (Ind. 978) ].
>
> Thus, *Res judicata* would not appear to be applicable.

*In re Banning,* 541 N.E.2d at 284 n. 2. *Banning,* like *Taylor,* is of no help to Samer. *Pence* is equally inapposite. *See*

*Pence v. Pence,* 667 N.E.2d 798 (trial court's order temporarily terminating parent's visitation rights was reversed because the parent's due process rights were violated).

I.C. § 31-17-4-1 (West, PREMISE through 2006 2nd Regular Sess.), the statute that currently governs a trial court's decision to award or deny parenting time, does not require the trial court to consider prescribed factors. Rather, it states, in relevant part, that "[a] parent not granted custody of the child is entitled to reasonable parenting time rights unless the [trial] court finds, after a hearing, that parenting time by the noncustodial parent might endanger the child's physical health or significantly impair the child's emotional development." Whatever the value of a trial court considering the factors listed in I.C. § 31-17-2-8, if any, in making a parenting time determination, it is clear that such is not required, and, therefore, the trial court did not abuse its discretion by failing to consider those factors.

### 3.

 Samer contends several of the trial court's findings and conclusions were clearly erroneous. When, as here, the trial court enters findings of fact and conclusions of law, its findings and conclusions shall not be set aside unless clearly erroneous. *Nowels v. Nowels,* 836 N.E.2d 481 (Ind.Ct.App.2005). "A finding or conclusion is clearly erroneous when a review of the evidence leaves us with the firm conviction that a mistake has been made." *In re Z.T.H.,* 839 N.E.2d 246, 249 (Ind.Ct. App.2005). We review the judgment by determining whether the evidence supports the findings and whether the findings support the judgment. *Nowels v. Nowels,* 836 N.E.2d 481. We consider only the evidence favorable to the judgment and all reasonable inferences to be drawn from that evidence. *Id.* We neither

reweigh the evidence nor assess witness credibility. *Id.*

 Samer argues the trial court's Finding 12 is clearly erroneous because the evidence does not support the finding that he remains an Egyptian citizen or a dual citizen of the U.S. and Egypt. Finding 12 states, "Samer has attempted to renounce his Egyptian citizenship. He states that his passport has been destroyed. However, Egypt does not recognize this renunciation. Absent a specific order by the Egyptian President, [Samer] remains free to obtain a new Egyptian passport." *Id.* at 13.

Dabbagh testified that she is familiar with Egyptian law. Dabbagh stated that, according to her understanding of Egyptian law, in order to render the renunciation of one's citizenship effective and authentic, one is required to procure "[Egyptian] President Mubarric's [sic] seal and personal signature." *Transcript* at 337. Dabbagh further stated that if one renounces his Egyptian citizenship, he may regain it later. "You just go ask for it. You just like say well, you know, I only did it because, you know, I was trying to get this job or, you know, whatever, a moment of insanity or what ever. It's much, actually it's very easy to get back. It's very difficult to renounce." *Id.*

at 338. The trial court acted within its discretion when it adopted Dabbagh's and rejected Samer's contrary understanding of Egyptian law. There was evidence to support the finding that Samer is either an Egyptian citizen or a dual citizen of the U.S. and Egypt. The trial court's finding, therefore, was not clearly erroneous.[7]

 Samer next argues the trial court's Finding 9(b) is clearly erroneous because the evidence does not support the finding that he has strong family ties in Egypt. Finding 9(b) states, in relevant part, that:

[Risk] **Profile 5. When one or both parents are foreigners ending a mixed-culture marriage.** "Parents who are citizens of another country (or who have dual citizenship with the U.S.) and also have strong ties to their extended family in their country of origin have long been recognized as abduction risks. . . . Often in reaction to being rendered helpless, or to the insult of feeling rejected and discarded by the ex-spouse, a parent may try to take unilateral action by returning with the child to [his] family of origin. This is a way of insisting that [his] cultural identity b[e] given preeminent status in the child's upbringing."

7. We grant Sheanin's "Motion To Strike Addendum to Appellant's Brief." In her motion to strike, Sheanin states, "[t]he Addendum contains a single document, namely what purports to be 'Egyptian Gazette of 26 May 1975, Edition No. 22, Law No. 26 of 1975 issue[d] on 29 May 1975, Concerning Egyptian Nationality,' apparently in Arabic as well as in an uncertified English translation that Samer allegedly obtained." Among the other concerns about what Samer purports to be Egyptian law, our primary concern, and the basis upon which we grant Sheanin's motion to strike, is that "[t]his document . . . was not before the trial court in this matter . . . and, therefore, could not have been used by the trial court in rendering the decision that Sam-

er is appealing." *Appellee's Motion to Strike* at 2. We do note, however, that if the document Samer submitted upon appeal accurately reflects prevailing Egyptian law, it casts serious doubt upon Dabbagh's testimony regarding the requirements for renouncing one's Egyptian citizenship and, consequently, her assessment, and the trial court's findings to the extent they are based upon that assessment, of the risk Samer poses to abduct A.S. We further note that a trial court's parenting time determination may be modified. *See* I.C. § 31–17–4–2 ("[t]he court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child").

Although Samer's mother and father are deceased, he has substantial ties to his brother, who is an Egyptian national living in the United States. He also has extended family in Egypt.

*Appellant's Appendix* at 12.

Regarding Samer's family ties in Egypt, Dabbagh stated:

he was born [in Egypt], he was raised there, that's his home country, that's where [h]is family is from, that's where he continues to have family and friends, so where you have significant connections you have a support system and the support system also includes individuals that share the same like ideology, the same like belief system, they would . . . be supportive of [his] action or decisions that [he] had made in regarding abduction.

*Transcript* at 356–57.

Samer testified that his mother and father are deceased, and his brother, sister-in-law, niece, and nephew live in Massachusetts. Samer has relatives that live in Egypt, including three uncles, one aunt, several half-brothers and half-sisters, and cousins, although Samer stated he does not "have any affiliation with them actually." *Id.* at 409. Samer also has a "Godmother" in Egypt with whom he was close, *id.* at 417, but stated, "[s]he's feebly old" and he does not "know if she is still living or not." *Id.* at 418. Based upon this evidence, the trial court found that Samer met the description of a potential abductor characterized in "Profile 5[,]" *i.e.*, he is a citizen of a foreign country or has dual citizenship and has "strong ties to [his] extended family in [his] country of origin. . . ." *Appellant's Appendix* at 12. There was evidence to support the trial court's finding, and,

therefore, its finding was not clearly erroneous.

 Samer further argues the trial court's Finding 11 is clearly erroneous because the evidence does not support the finding that A.S. remains an Egyptian national regardless of Samer's Egyptian citizenship status. Finding 11 states, in relevant part, "[t]he government of Egypt considers all children born to Egyptian fathers to be citizens of Egypt. Thus, [A.S.] is a dual citizen of the United States and Egypt." *Id.* at 13. Dabbagh testified that, under Egyptian law, "[i]ndividuals of Egyptian decent [sic] automatically . . . inherit their [f]ather's Egyptian nationality where ever they're born geographically." *Transcript* at 325. Dabbagh further stated:

[A.S.] continues to be an Egyptian [c]itizen and entitled to an Egyptian passport regardless of her [f]ather's nationality. In other words, the child still has access to an Egyptian passport. [A.S.] will still enjoy the privileges and pleasures of being an Egyptian [c]itizen because she is not the one renouncing her citizenship.

*Id.* at 336. Dabbagh testified that in order for A.S. to renounce her Egyptian citizenship, she, like Samer, was required to secure Egyptian President Mubarak's seal and personal signature. Based upon Dabbagh's testimony, the trial court found, contrary to Samer's conflicting assertions, that A.S. remained a dual citizen of the U.S. and Egypt. The trial court's finding was not clearly erroneous because there was evidence to support it.[8]

---

8. We note that if the document Samer submitted upon appeal accurately reflects prevailing Egyptian law, the trial court's finding that A.S. remains a dual citizen of the U.S. and Egypt also is cast into serious doubt. We reiterate, however, that such evidence was not before the trial court.

**4.**

[redacted] Samer contends the trial court manifestly abused its discretion in its parenting time order because it permitted Sheanin or someone of her designation to supervise Samer's parenting time with A.S. Upon review of a trial court's determination of a parenting time issue, we reverse only when the trial court manifestly abused its discretion. *J.M. v. N.M.*, 844 N.E.2d 590 (Ind.Ct.App.2006), *trans. denied.* The trial court does not abuse its discretion if there is a rational basis in the record supporting its determination. *Id.* Upon appeal, we neither reweigh the evidence nor judge the witnesses' credibility. *Id.* In all parenting time controversies, courts are required to give foremost consideration to the best interests of the child. *Id.*

Samer argues that allowing Sheanin or her appointee to supervise his visits with A.S. will have a detrimental impact upon his relationship with A.S. because "[Sheanin's] distrust of and hostility toward [Samer] is apparent[, and Sheanin's] ... parents' and brother's attitude[s] toward[ ] [Samer] [are][ ] negative." *Appellant's Brief* at 23. Samer concludes, therefore, that "[i]t is hardly likely that [Samer's] and [A.S.'s] relationship can continue to flourish under such hostile conditions[,]" *id.* at 23–24, which, he asserts, violates the Indiana Parenting Time Guideline's "premise that it is usually in a child's best interest to have frequent, meaningful and continuing contact with each parent." Ind. Code Ann. Title 34, *Preamble For Indiana Parenting Time Guidelines* (West, PREMISE through Amendments received through June 1, 2006).

We first note that Sheanin's or her appointee's supervision of Samer's parenting time with A.S. has no impact upon the frequency or continuation of A. S.'s contact with Samer. We further note that Samer was not denied parenting time. Rather, his parenting time was ordered to be supervised within certain parameters designed to protect A.S.'s best interests based upon the trial court's finding that "deviation from the Indiana Parenting Time Guidelines is warranted, and strict preventive measure[ ]s are needed to insure the wellbeing of [A.S.]" *Appellant's Appendix* at 14. In light of the facts as set forth above, the trial court did not manifestly abuse its discretion when it concluded deviation from the Indiana Parenting Time Guidelines was warranted. Samer's argument, therefore, fails. *See J.M. v. N.M.*, 844 N.E.2d 590 (trial court did not manifestly abuse its discretion when it ordered supervised parenting time because the father's behavior continued to scare the child and was detrimental to the child's well being).

Judgment affirmed.

CRONE, J., and DARDEN, J., concur.