Shane Allen BLASIUS, Appellant–
Respondent,

v.

Stephen Earnest WILHOFF, Jr. and
Heidi Ann Wilhoff, Appellees–
Petitioners.

No. 02A03–0609–CV–402.

Court of Appeals of Indiana.

April 10, 2007.

Kendra Gowdy Gjerdingen, Mallor Clendening Grodner & Bohrer, LLP, Bloomington, IN, Attorney for Appellant.

Mark C. Chambers, Melanie L. Farr, Haller & Colvin, P.C., Fort Wayne, IN, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge.

The trial court awarded Stephen E. and Heidi A. Wilhoff (the Wilhoffs) custody of A.B. Shane A. Blasius, A.B.'s biological father, now appeals, presenting the following restated issue for review: Did the trial court abuse its discretion by awarding the Wilhoffs custody of A.B.?

We affirm.

The factual and procedural postures of this case are unique. Prior to A.B.'s birth, Blasius registered with Indiana's putative father registry. Thereafter, Monica L.

Murray gave birth to A.B. on January 16, 2002. On that date, Blasius was nineteen years old and Murray was eighteen years old. The following day, on January 17, Murray filed a voluntary consent to the termination of her parent-child relationship with and the adoption of A.B.,[1] in which she transferred physical custody of A.B. to Catholic Charities Diocese of Fort Wayne–South Bend (Catholic Charities). The same day, Murray completed an affidavit concerning the alleged father, in which she stated A.B. was conceived as the result of rape. The person whom Murray alleged raped her, and whom Murray purportedly believed to be A.B.'s biological father, was not Blasius. Also on January 17, the Wilhoffs picked up A.B. from the hospital and assumed custody of her. The Wilhoffs did so as prospective adoptive parents of A.B. pursuant to an agreement with Catholic Charities in which they "acknowledge[d] ... that Catholic Charities ha[d] made no promise or representation[ ] ... regarding the permanency of th[e] placement ... [and] that the placement [was] at-risk and subject to termination." *Appellant's Appendix* at 156.

On January 28, 2002, Catholic Charities filed a verified petition for the voluntary termination of Murray's parent-child relationship with A.B. On February 21, 2002, the Wilhoffs filed a petition to adopt A.B. On April 10, 2002, Blasius filed a petition to establish paternity of A.B. and a motion to contest the Wilhoffs' adoption of A.B. On April 25, 2002, Catholic Charities, on behalf of Murray, filed a motion to dismiss the termination of parental rights petition because "certain information provided to Catholic Charities which was, in good faith, included by Catholic Charities in its Petition [for the voluntary termination of Murray's parent-child relationship with A.B.], was later discovered to be inaccurate." *Id.* at 210. The trial court dismissed Catholic Charities' petition on May 10, 2002, and on June 12, 2002, based on a 99.325% probability of paternity, Blasius was determined to be A.B.'s father.

On December 2, 2002, Catholic Charities filed a "Final Report to the Court[.]" *Id.* at 157. The following is a summary of the relevant information contained in Catholic Charities' report. A.B. has remained in the Wilhoffs' home and care since January 17, 2002. A.B. appeared to be healthy, active, and developing and flourishing in the Wilhoffs' care. A.B.'s physical development was good and immunizations were current. A.B. appeared to recognize the Wilhoffs and respond to them as parents. Stephen had a father (his mother was deceased) and three sisters, and shared a good, close, supportive relationship with each of them. Stephen has worked in sales for the previous eighteen years, and has been the finance manager at a car dealership for the last five years. Stephen took the Minnesota Multiphasic Inventory (MMPI) test, which indicated he is a very sensitive individual who enjoys being with people and is competent. Dr. Ina Carlson, the person who administered the MMPI test, concluded there were no particular concerns about Stephen's ability to parent.

Heidi has a mother, father, and brother, and has a good relationship with each. Heidi has been a full-time homemaker since September 2001. Heidi also took the MMPI test. The results indicated Heidi is difficult to know well, but is easygoing,

---

**1.** Regarding the status of Murray's parental rights, the trial court found that Murray "executed a voluntary consent to the termination of her parental rights.... The record is unclear whether parental rights were thus terminated. Nevertheless, the mother consented to the placement of the child with the [Wilhoffs]." *Appellant's Appendix* at 39. To this, we add that Murray continues to have parenting time with A.B. and pays child support pursuant to a court order.

down-to-earth, predictable in her behavior, and possesses an even temperament. Dr. Carlson concluded Heidi is capable of parenting well. State police, local police, and the Allen County Office of Family and Children searches revealed no criminal records for the Wilhoffs.

Blasius completed the Allen Superior Court Criminal Division PRI Drug and Alcohol Education Course on March 24, 2004, and completed the Alcohol Countermeasures Program on November 21, 2004. On January 21, 2005, the Wilhoffs' adoption petition was denied, but the trial court awarded them custody of A.B. In its order, the trial court stated, in relevant part:

21. [Blasius's] drug usage, his criminal history, his lack of positive and healthy support persons, his lack of financial stability, and his maintenance of a lifestyle that does not create a healthy environment for a small female child, causes the [c]ourt to conclude that [Blasius] is unfit to be the custodial parent.

22. The court further concludes that [A.B.] has only known the [Wilhoffs] as her primary parents. A significant emotional tie continues to exist between them. The [Wilhoffs] have always respected [Blasius's] desire to maintain contact with [A.B.] and have not deterred a relationship between [A.B.] and [Blasius]. [Murray] believes [A.B.'s] best interests are served by continuing the child in the [Wilhoffs'] care. The [Wilhoffs] are in a superior position to that of either natural parent to provide for the health, safety and needs of [A.B.] Accordingly, the court concludes that the [Wilhoffs] should be granted custody of [A.B.]

*Id.* at 33–34.

Thereafter, on February 22, 2005, Blasius filed a motion to correct errors in which he asserted, among other things, that the trial court erred by not setting a subsequent hearing on the issue of custody and by requiring the parties to file a separate action for determination of custody. On June 13, 2005, the trial court granted in part Blasius's motion. In its order, the trial court stated, "[a] custody hearing under the adoption to determine the child's best interests is hereby ordered scheduled. In the interim, and by way of provisional order, the child is ordered continued in the care and custody of the [Wilhoffs]." *Id.* at 40.

On February 17, 2006, a hearing was held regarding custody of A.B. Following the hearing, the trial court issued the order now being appealed. The order stated, in relevant part:

2. Shortly after her birth, the child was placed in the care of the [Wilhoffs] as prospective adoptive parents. The mother had consented to the adoption and the termination of her parent-child relationship. On February 21, 2002, the [Wilhoffs] filed their petition to adopt the child. In the context of their petition for adoption, the [Wilhoffs] alleged that [Murray] claimed that the child was born as a result of rape and that the name of the father was unknown. They later learned that [Blasius] had registered with the putative father registry prior to the child's birth and that no rape had occurred. On April 10, 2002, [Blasius] filed a petition to establish paternity. On June 12, 2002, [Blasius] was adjudicated to be the father of the child.... A motion to contest the adoption was heard by the court and the adoption was dismissed.

3. Notwithstanding the dismissal of the adoption, the Court found that [Bla-

sius] was unfit as a parent and that the best interests of the child were served by continuing her in the custody of the [Wilhoffs]. . . .

4. In determining [Blasius] to be unfit as a parent, the Court cited his drug usage, his criminal history, his lack of positive and healthy support persons, his lack of financial stability, and his maintenance of a lifestyle that did not offer a healthy environment for a small female child. In finding that the child's best interests were served by placing her in the temporary custody of the [Wilhoffs,] the court cited the fact that the child had known only the [Wilhoffs] as her primary parents and that a significant emotional bond existed between them. In addition the court noted that the [Wilhoffs] did not deter a relationship between the child and her natural father and cooperated with his visitation. At that time the [Wilhoffs] were in a superior position to that of either natural parent to provide for the health, safety and needs of the child. A custody hearing under the adoption was ordered set and the child was ordered continued in the care and custody of the [Wilhoffs].

\* \* \*

6. Since the date that the adoption / custody order was issued, [Blasius] has worked to rehabilitate himself. [Blasius] has completed the Allen Superior Court Criminal Division PRI Drug and Alcohol Education Course [o]n March 24, 2004[ ][and][t]he Alcohol Countermeasures Program on October 21, 2004, and parenting classes on December 14, 2005. He has maintained his sobriety since December, 2003.

7. On August 27, 2005, [Blasius] married. He has been active with his wife in church activities. His wife has a positive relationship with the child.

8. [Blasius and his wife] recently purchased a home on 2.5 acres in a rural setting. The house is an older farmhouse that [Blasius] has devoted considerable time to restore.

9. Some questions about the full extent of [Blasius's] rehabilitation remain. [Blasius] has retained ownership of the home in which he resided when the adoption hearing was held. He has attempted to sell the home on contract to Michael Higi. [Blasius] insisted that he only had a casual relationship with [Higi]. However, Mr. Higi was his best man at his wedding. Mr. Higi's [girlfriend] testified, and the court finds, that [Blasius] regularly visited Mr. Higi at the home. During that time, marijuana, cocaine and stolen property w[ere] secreted on the property. Mr. Higi has been subsequently evicted for nonpayment of his contract installments.

10. Issues as to [Blasius's] financial stability also continue. [Blasius] was employed at Dimension Ford as a mechanic. He later left that job and was employed at Yoder and Yoder Construction. He now is self[-]employed doing business as "Complete Property Management". He earns approximately $635.00 per month. He has applied for employment with the county highway department. [Blasius] and his wife report a net income of $1,625.00; an amount that is insufficient to meet their monthly expenses of over $3,500.00.

11. ... [Blasius] has exercised parenting time with the child on alternate weekends and on one evening each week....

\* \* \*

13. [Murray] believes that the best interests of her daughter are served by continuing [A.B.] in the care and custody of the [Wilhoffs].

14. The [Wilhoffs] were married in 1981. They are the parents of an infant child to whom [A.B.] is bonded.

15. ... Stephen Wilhoff[ ] is 45 years old, is employed and earns between $30,000.00 and $40,000.00 per year.... Heidi Wilhoff[ ] is 44 years old, is employed part time and receives a wage of approximately $200.00 per week.

16. The [Wilhoffs] have an appropriate residence and have demonstrated the financial ability to provide for the child since her birth.

\* \* \*

18. The [Wilhoffs] and [Blasius and Murray] love the child.

19. Dr. Stephen Ross completed an evaluation by which he concluded that a gradual transfer of custody could minimize the trauma to the child. His conclusions are based on limited contact with the child, however. In addition, Dr. Ross has not interviewed the [Wilhoffs]. In contrast, the child's therapist, Laura Michmerhuizen, reports that the child is very engaged with the [Wilhoffs]. For example, [A.B.] calls ... Stephen Wilhoff[ ] her Prince Philip. The therapist advises that any separation from the [Wilhoffs] will be very traumatizing to the child. The court concludes that the concerns of the therapist should be afforded greater weight given her more extensive experience with the child.

20. In therapy [A.B.] has been very guarded in her comments about [Blasius]. In one instance she was asked to draw pictures of her two homes. She drew pictures of the [Wilhoffs] but declined to draw a picture of [Blasius's] noting that "Papa wouldn't like that".

21. In his evaluation of [Blasius], Dr. Ross found no evidence of any elevated scales in the Personality Assessment Inventory, the Child Abuse Potential Inventory or from the Parent–Child Relationship Inventory.

**The Court ... Concludes That:**

\* \* \*

4. The Court previously determined that [Blasius] was an unfit parent and the court found by [ ] clear and convincing evidence that the child's best interests were served by granting a third party custody. The Court concluded that the prerequisites for a grant of custody to a nonparent described in *[In re Guardianship of B.H.,* 770 N.E.2d 283 (Ind.2002)] were met.

5. While [Blasius] has rehabilitated himself, the circumstances that impact the best interests of the child are not substantially different than that which were evidence when the court first determined custody.

6. Given their actions to date, the court concludes that the [Wilhoffs] stand in the unique position of offering and insuring the child a continuation of her positive relationships and regular contact with [Murray] and her extended family, [Blasius] and his extended family and with the ex-

tended family who has raised her since birth. Minimal strife exists between those families in the current arrangement. A change of custody is not likely to encourage the level of family harmony that now exists for the child. Given the emotional bond the child has with the [Wilhoffs] and the probable emotional harm that may result from her separation from them the bests interest of the child are served by continuing her in the custody of the [Wilhoffs].

*Appellant's Appendix* at 10–14. Blasius now appeals.

■ Blasius contends the trial court erred by awarding the Wilhoffs custody of A.B. Child custody determinations are within the trial court's discretion and will not be disturbed except for an abuse of discretion. *Truelove v. Truelove,* 855 N.E.2d 311 (Ind.Ct.App.2006). We will not reverse the trial court's decision unless it is against the logic and effect of the facts and circumstances before it or the reasonable inferences drawn therefrom. *Id.* In this case, the trial court entered special findings of fact and conclusions of law. We must determine, therefore, whether the evidence supports the findings and whether the findings support the judgment. *Id.* Neither the findings nor the judgment will be set aside unless they are clearly erroneous. *Id.* Findings of fact are clearly erroneous if the record lacks any evidence or reasonable inferences to support them. *Id.* A judgment is clearly erroneous when it is unsupported by the findings and the conclusions relying on the findings. *Id.*

■ In this case, the trial court awarded custody of A.B. to the Wilhoffs, who are third parties, rather than Blasius, A.B.'s biological father. Before placing a child in the custody of someone other than a biological parent, a trial court must be satisfied by clear and convincing evidence that the child's best interests require such a placement. *Id.* The presumption in favor of the biological parent will not be overcome merely because a third party could provide better things for the child. *Id.* In a proceeding to determine whether to place a child with a person other than a biological parent, evidence establishing the biological parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, is important, but the trial court is not limited to these criteria. *Id.* The issue is not merely the "fault" of the biological parent. *Id.* at 314. Rather, it is whether the important and strong presumption that a child's interests are best served by placement with the biological parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. *Truelove v. Truelove,* 855 N.E.2d 311. This determination falls within the trial court's sound discretion, and its judgment must be afforded deferential review. *Id.*

■ Blasius argues the trial court's conclusion that " 'the circumstances that impact the best interests of the child are not substantially different than that which were evident when the court first determined custody' " is clearly erroneous. *Appellant's Brief* at 17 (quoting *Appellant's Appendix* at 13). The trial court found that a significant emotional bond exists between A.B. and the Wilhoffs. The trial court further found that Higi, the best man at Blasius's wedding, resided in a home that Blasius owned, that Blasius regularly visited the home (despite Blasius's claim that Higi was merely a tenant and an acquaintance), and that police found marijuana, cocaine, and a stolen motorcy-

cle at the home. Additionally, the trial court found that Blasius's finances are unstable.

There is evidence supporting the trial court's findings. A.B. refers to the Wilhoffs as mom and dad and has lived with them her entire life. Further, Higi's girlfriend testified that Blasius went to the home in which Higi resided many times, that the two went into and spent time in a room in which marijuana was stored, and that Blasius borrowed from Higi a scale used to weigh marijuana. Higi's girlfriend also testified that Blasius maintained a key to the attic in which the stolen motorcycle was found. Finally, Blasius and his wife have a combined monthly income of approximately $1,625, and monthly expenses of approximately $3,500. Although there was evidence that A.B. refers to Blasius as papa and dad, that Blasius has rehabilitated himself and acquired parenting skills, and that he is seeking more lucrative employment, there is evidence to support the trial court's findings and, therefore, its findings are not clearly erroneous. To the extent Blasius requests that we accept his testimony to the exclusion of the other witnesses' contrary testimony, we decline to do so. *See Shady v. Shady,* 858 N.E.2d 128 (Ind.Ct.App.2006) (we neither reweigh evidence nor judge witnesses' credibility), *trans. denied.*

Blasius further argues the trial court's conclusion that the Wilhoffs " 'stand in the unique position of offering and insuring the child a continuation of her positive relationships and regular contact with her mother and her extended family, her father and his extended family and with the extended family who has raised her since birth[,]' " *i.e.,* the Wilhoffs, is clearly erroneous. *Appellant's Brief* at 22 (quoting *Appellant's Appendix* at 13–14). The trial court found that a bond exists between A.B. and the Wilhoffs and A.B. and Blasi-

us. The trial court further found that the Wilhoffs did not deter a relationship between A.B. and Blasius, that the Wilhoffs cooperated with Blasius's visitations, and that a change of custody would be unlikely to encourage the level of harmony that existed for A.B. Further, the Wilhoffs and Blasius maintain a relatively cooperative relationship that facilitates a harmonious relationship between A.B. and Blasius and A.B. and Murray. Additionally, Murray testified that she and Blasius have spoken on only several occasions since A.B.'s birth. Murray also stated that she believed it is in A.B.'s best interest for the Wilhoffs to have custody of A.B. There is evidence supporting the trial court's findings and, therefore, its findings are not clearly erroneous.

■ Blasius also argues the trial court abused its discretion in awarding the Wilhoffs custody of A.B. because it could not and did not conclude that he is unfit, that he abandoned A.B. or acquiesced in the Wilhoffs' custody of her, or that A.B. will suffer long-term trauma as a result of removing her from the Wilhoffs' custody. Initially, we reiterate that evidence establishing the biological parent's unfitness or acquiescence, or demonstrating that a strong emotional bond has formed between the child and the third person, would be important, but the trial court is not limited to these criteria. *Truelove v. Truelove,* 855 N.E.2d 311. The trial court, therefore, did not *per se* abuse its discretion when it awarded the Wilhoffs custody of A.B. despite not finding unfitness, abandonment, or acquiescence.

Further, the trial court's failure to make a specific finding that separation from the Wilhoffs will cause A.B. long-term trauma is not dispositive of the issue. *In re Guardianship of L.L.,* 745 N.E.2d 222 (Ind.Ct.App.2001), *trans. denied,* the case upon which Blasius relies, does not stand

for such a proposition. *See id.* at 230–31 ("[e]vidence sufficient to rebut the presumption may, but need not necessarily, consist of the parent's present unfitness, or past abandonment of the child such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child"), 233 ("[s]uch an upheaval, where it can only be said to have potential short-term effects, is insufficient to deny a natural parent custody of his or her child"). In any event, Michmerhuizen, A.B.'s therapist, testified that separation from the Wilhoffs would be "very traumatizing to [A.B.]" *Transcript* at 126. Michmerhuizen did not qualify this opinion by stating the effects would be merely short-term. Although Ross believed the traumatic effect on A.B. of separation from the Wilhoffs would be much less severe than did Michmerhuizen, the trial court clearly assigned greater weight to Michmerhuizen's prognostication, and we will not engage in reweighing their respective testimonies. *Shady v. Shady,* 858 N.E.2d 128.

The evidence supports the trial court's findings, and the trial court's findings provide support for its judgment to grant the Wilhoffs custody of A.B. The trial court referred to the standard of review set out in our Supreme Court's opinion in *In re Guardianship of B.H.,* 770 N.E.2d at 287, that:

> before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interest of the child require such a placement. The trial court must be convinced that placement with a person

other than the natural parent represents a substantial and significant advantage to the child.

*See Appellant's Appendix* at 13 (quoting *In re Guardianship of B.H.,* 770 N.E.2d at 287). The trial court indicated A.B.'s best interests required that the Wilhoffs be given custody of her. In so doing, the trial court stated it "previously determined that [Blasius] was an unfit parent and the court found by clear and convincing evidence that the child's best interests were served by granting a third party custody[,]" and concluded that, "[w]hile [Blasius] has rehabilitated himself, the circumstances that impact the best interests of the child are not substantially different than that [sic] which were evident when the court first determined custody."[2] *Appellant's Appendix* at 13. The trial court was clearly convinced that placement with the Wilhoffs represented a substantial and significant advantage to A.B. According the trial court the appropriate deference, as we must, we cannot conclude its findings are clearly erroneous or that its judgment is against the logic and effect of the evidence. *See Allen v. Proksch,* 832 N.E.2d 1080 (Ind.Ct. App.2005).

Judgment affirmed.

KIRSCH, J., and RILEY, J., concur.

---

2. As noted above, the trial court previously granted the Wilhoffs provisional custody of A.B. pending a hearing on and the trial court's order granting permanent custody of A.B. Thus, we treat, as both parties treat, the trial court's order as an initial custody determination, rather than a modification of custody, and apply the concomitant standard of review.