## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 17 2015, 7:47 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Debra Lynch Dubovich
Levy & Dubovich
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Michael A. Fish
M. Jill Sisson
Valparaiso, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Paternity of N.W.


M.A.

*Appellant-Respondent,*

v.

N.W.,

*Appellee-Petitioner.*

June 17, 2015

Court of Appeals Case No. 45A03-1410-JP-376

Appeal from the Lake County Juvenile Court
The Honorable Aimee M. Talian, Magistrate
The Honorable Elizabeth G. Tegarden, Magistrate
The Honorable Thomas P. Stefaniak, Jr., Judge
Cause No. 45D06-1204-JP-1040


**Bailey, Judge.**

# Case Summary

In this paternity action, M.A. ("Mother") appeals the trial court's order awarding legal custody and primary physical custody of No.W. ("Child") to N.W. ("Father").

We affirm.

# Issues

Mother raises several issues for our review. We restate these as the single question of whether the trial court's decision to grant Father legal custody and primary physical custody of Child was an abuse of discretion because

1. The evidence did not support the findings;
2. The findings did not support the judgment; and
3. The judgment was clearly erroneous.

Father presents an issue for cross-appeal, namely, whether the trial court may, upon Father's motion after the conclusion of this appeal, take up Father's requests for attorneys' fees and reapportionment of Guardian ad Litem fees.

# Facts and Procedural History

Child was born on March 7, 2005 to Mother and Father, who were cohabiting in a non-marital relationship. Father acknowledged his paternity of Child. At some point, Father moved out of the residence. Father provided cash or other payments to assist in Child's support from the time Father left until around

February 2012. No formal orders concerning paternity, support, or parenting time had been sought or obtained.

[6] In January 2012, Mother lived in Highland with Child, who attended school in Highland; Father lived in Schererville. Father commenced a relationship with a woman who became, by the time of the present proceedings, Father's live-in girlfriend. On February 21, 2012, Mother refused to permit Father any further contact with Child. In response, Father ceased making any payments for Child's support.

[7] On April 3, 2012, Father filed a Verified Petition to Establish Paternity of Minor Child. In the petition, Father sought joint legal and physical custody of Child. **(Appellee's App'x at 1-2.)** Despite filing the petition, Father did not see Child until June or July 2012.

[8] After an initial hearing, an order was entered on October 15, 2012, effective *nunc pro tunc* to July 16, 2012. The court recognized Father's paternity of Child. The court also granted mother temporary custody of Child, subject to Father's parenting time rights under the Indiana Parenting Time Guidelines. The court granted Father temporary parenting time to consist of two overnight visits with Child on alternating weeks; one weekday visit with child for up to four hours, with Child to be returned to Mother by 9:00 p.m.; and any other parenting time Mother and Father might otherwise have agreed to. Because Father worked weekends as a chef, Father was to submit to Mother his work schedule together with any request for parenting time, so that the parties could arrange for

Father's visitation with Child. Transportation duties and expenses were to be shared by both parents. Father was also ordered to pay weekly child support of $101.44, and the order allocated insurance and payment of costs associated with Child's medical care.

[9] Mother denied Father parenting time or any other opportunity to see Child on or around Halloween in 2012. This began another period during which Father was not permitted by Mother to see Child, and Father was denied visitation during both Thanksgiving and Christmas. Mother gave various explanations for denying parenting time to Father, including allegations that Father and his girlfriend were verbally abusive toward Child, and that Father was consistently late in picking up or dropping off Child from various locations. Mother claimed that Father's interactions with Child caused Child to become extremely distressed, and thus Mother permitted Child to decide not to leave with Father for parenting time under the initial hearing order of October 15, 2012.

[10] Due to the conflict over parenting time, Julie Demange ("Demange") was appointed to serve as a Guardian ad Litem in the case. Demange inquired into the reasons for Child's resistance to participating in parenting time. Concluding that Father's occasionally rough parenting played a role, Demange met with Father, who agreed to address concerns about his parenting style. Demange also served as an intermediary between Mother and Father in coordinating parenting time during portions of 2013.

[11] Nevertheless, before March 2013 Father saw Child once, in February 2013, when Mother agreed to permit Father to see Child after Child expressed interest in receiving Father's Christmas gifts. Child acknowledged that Father's parenting style improved, and reported enjoying spending time with Father. Eventually, however, Mother and Father agreed to a parenting time schedule for the summer of 2013, during which they would alternate weeks.

[12] The first week of parenting time for Father began with difficulty, including a scheduling problem with Mother that prevented Father from seeing Child for several days. Child also cried for significant portions of the first night with Father, but eventually calmed down. During that first night, however, Child called Mother, who said she would come retrieve Child; Mother never did so, however.

[13] Inquiring into these events, Demange discussed the situation with Child, who appeared to believe that his participation in parenting time was optional and that he could go back to Mother's home when he wished. Mother's interactions with Demange took an adversarial turn at times, including regular and repeated allegations that Father had abused Child. Mother stated to Demange, "I will never do anything to help foster the relationship between [Child] and his biological father." Tr. at 27.

[14] Subsequent weeks of extended parenting time during summer 2013 were also difficult. Mother had filed a petition to change Child's last name, seeking either to have Child's last name changed to hers or at least to be hyphenated, despite

having agreed with Father earlier in their relationship to give Father's last name to Child. Yet upon taking Child to camp in summer 2013, Father learned that Mother had registered Child under Mother's last name.

[15] During the school year, Mother refused to permit Father to pick Child up from school, and instead had Child go to a babysitter who watched a number of other children.[1] When she did permit Father to pick up Child, Mother nevertheless would not agree to inform the school that Father was permitted to do so. Thus, Child would have to walk off of the school campus and meet Father off school grounds.

[16] Mother's interactions with Father were frequently marked with threats to call police. On at least one occasion, Mother called police to perform wellness checks on Father and Child during Father's parenting time.

[17] Extended parenting time was also attempted during summer 2014. Child stayed with Father for a few days after school ended for the summer, and spent the second full week of summer break with Father. Father never had parenting time or contact with Child for the rest of the summer. Father would request parenting time in a general way, and Mother would not respond. Only in late July, when Father made a highly specific request for parenting time on a specific day for a specific range of time, did Mother respond to Father or agree to allow him to pick up Child. Even at this point—with what Mother

---

[1] In her testimony, Mother stated she did not know whether the babysitter was a licensed childcare provider.

considered to be a proper request—Mother threatened Father with police involvement, saying that "[t]he police do not care about your incoherent rambling." Ex. 10.

[18] As a result, Mother agreed to allow Father to pick up Child on August 3, 2014, from 8 a.m. until 8 p.m. Father arrived at around 7:30 a.m. to pick Child up from Mother's home. Child refused to leave, speaking to Father through a partially-open window. Father attempted to communicate through the window with Mother, who did not respond to Father. Father also consulted with police, who informed Father that they could not provide assistance.

[19] Beginning in November 22, 2013, the trial court heard testimony on the custody and parenting time issues raised in Father's petition, as well as on several other pending matters involving child support, Mother's petition to change Child's name, and Father's petition to hold Mother in contempt of court for failing to comply with the trial court's order concerning parenting time. Testimony was heard on November 22, 2013, January 17, 2014, and January 24, 2014 by Magistrate Elizabeth G. Tegarden.

[20] Magistrate Tegarden was unavailable to hear the remainder of the evidence at a hearing set for August 14, 2014. The parties agreed Magistrate Aimee Talian would preside over the final hearing day and, prior to that, would listen to the audio recordings of the testimony conducted before Magistrate Tegarden. Magistrate Talian listened to the audio recordings of the prior testimony and then, on August 14, 2014, personally heard the remainder of Father's

testimony, as well as all of Mother's testimony. During her testimony, Mother repeatedly insisted that she would not release her child into the care of an abuser, referring specifically to her beliefs concerning Father's conduct toward Child and to Father's prior encounters with law enforcement.

[21] On September 22, 2014, the court entered findings and conclusions on various pending matters. The court found that Mother had repeatedly thwarted Father's efforts at exercising parenting time by refusing to cooperate with scheduling of parenting time and scheduling child's extracurricular activities during Father's parenting time. The court observed that Child appeared to believe he could dictate the terms of parenting time with Father, an impression the court found was the result of Mother's interference with Father's parenting time. The court also found that Mother had engaged in "destructive and deliberate" efforts to damage Father's relationship with Child that amounted to "parental alienation." Appellant's App'x at 23. The court found Mother's repeated allegations of abuse by Father to lack credibility, and found that Father genuinely cared for child and had taken steps to improve his parenting style.

[22] As a result, the trial court ordered that Father be awarded sole legal custody and primary physical custody of Child. The court found this determination to be in Child's best interests, and to be "the only way to enable the child to restore his relationship with Father with limited interference from Mother." Appellant's App'x at 23. The court arranged parenting time as follows:

> Mother is awarded … parenting time … [e]very other Thursday
> commencing at 6:00 p.m. continuing through Sunday at 6:00 p.m.,
> and in those alternating weeks where Mother does not exercise
> weekend parenting time, she shall be entitled to parenting time
> Wednesday evening at 6:00 p.m. through Friday morning at 9:00 a.m.
> or the start of the school day, whichever is earlier. Each party shall be
> entitled to seven (7) consecutive days during the summer and the
> parties shall make their designation no later than April 1st of that year.
> The parties shall exercise holiday parenting time through strict
> adherence to the Indiana Parenting Time Guideline Schedule.

Appellant's App'x at 23.

[23]   The court further ordered Father to begin individual therapeutic counseling sessions for Child, with instructions that Mother and Father both participate as recommended by Child's therapist. Father was also encouraged to allow Child to continue his extracurricular activities of swimming and music lessons. The court denied Mother's request to change Child's name, and ordered Mother to pay weekly child support and to continue providing Child's primary health insurance coverage. Finally, the court ordered the parties to submit additional information regarding child support arrearages, and to participate in parenting classes for high-conflict families.

[24]   This appeal ensued.

# Discussion and Decision

## Legal Standard

[25]   The Indiana Code provides statutory factors that trial courts must consider when reaching a custody determination:

The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Ind. Code § 31-14-13-2.

[26] Here, the trial court was presented with an initial custody determination. In such cases, the court must "consider all evidence from the time of the child's birth in determining the custody arrangement that would be in the best interest of the child." *In re Paternity of M.W.*, 949 N.E.2d 839, 843 (Ind. Ct. App. 2011).

[27] Child custody determinations rest within the trial court's discretion, and we review a trial court's decision in such cases for abuse of that discretion. *Blasius v. Wilhoff*, 863 N.E.2d 1223, 1229 (Ind. Ct. App. 2007), *trans. denied.* An abuse

of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or the reasonable inferences drawn therefrom. *Id.*

[28] Here, the trial court entered findings of fact and conclusions thereon. Reviewing findings and conclusions, we look to whether the evidence supports the findings, and whether the findings support the judgment. *Id.* Unless there is clear error, we will not set the judgment aside. *Id.* Findings of fact are clearly erroneous when those findings lack any supporting evidence or reasonable inferences from the evidence. *Id.* We will reverse a judgment for clear error when the record contains no facts or inferences supporting the findings and conclusions, so that "a review of the record leaves us with a firm conviction that a mistake has been made." *Bowyer v. Ind. Dept. of Natural Res.*, 882 N.E.2d 754, 761 (Ind. Ct. App. 2008). In assessing the record, we do not reweigh evidence or reassess the credibility of witnesses, and consider only the evidence that favors the judgment. *Id.* We review conclusions of law *de novo*. *Id.* Where, as here, the findings and conclusions were entered *sua sponte*, where the court entered no findings, a general judgment standard applies and we may affirm on any legal theory supported by the evidence. *Samples v. Wilson*, 12 N.E.3d 946, 950 (Ind. Ct. App. 2014).

[29] In her appeal, Mother draws the court's attention to the procedural history of this case, and argues that our ordinary standards of review do not apply. Mother points to the change from Magistrate Tegarden to Magistrate Talian during the course of the evidentiary hearing, and argues that this is akin to a

case in which the trial court had only a paper record before it from which to decide the case. Accordingly, Mother argues, the proper standard of review to employ here is *de novo* review of the trial court's judgment.

[30] Mother relies here upon the Indiana Supreme Court's decision in *In re Adoption of C.B.M.*, 992 N.E.2d 687 (Ind. 2013). In *C.B.M.*, the trial court denied a motion to set aside judgment of an adoption decree under Trial Rule 60(B)(7). *Id.* at 691. In *C.B.M.*, however, the trial court ruled "'on a paper record without conducting an evidentiary hearing.'" *Id.* (citing *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind. 2001)).

[31] Here, Magistrate Talian did not rely solely on a paper record. Magistrate Talian presided over one day of testimony in person after listening to the audio recordings of prior testimony presented before Magistrate Tegarden. These recordings consisted of Demange's testimony and a portion—but not all—of Father's testimony. Magistrate Talian was also presented in person with testimony from Father and Mother, and conducted an *in camera* interview with Child. Magistrate Talian was afforded an opportunity to observe testimony from Father—whose testimony on August 14, 2014 was not substantially different from his prior testimony—and from Mother. She was thus afforded the opportunity to assess each parent's credibility, was able to compare Father's testimony over multiple days with his testimony on August 14, and was able as well not only to read but to hear testimony from Demange. We accordingly find *C.B.M.* inapposite, and do not deviate from our previously-announced standards of review.

# Findings in Light of the Evidence

[32] On appeal, Mother contends that the evidence presented during the hearing did not support the trial court's findings. Mother identifies five findings of fact that, she contends, are clearly erroneous and warrant reversal of the judgment.

[33] Mother first identifies a portion of Finding 8, which states, "Although, [Child] told the school counselor that he wanted to see his father." Appellant's App'x at 22. Mother contends that this is incorrect, and that even if correct it had no bearing upon Child's preferences for parental custody, since Child's clear preference as expressed through his behavior was to remain with Mother.

[34] As to the evidentiary grounding of Finding 8, we observe that Mother's argument disregards notes given to Demange by one of Child's guidance counselors. Those notes include the following: "Do you like going to see dad – 'yes' I wish I could see him more." Ex. 4. And while Child's preferences are a factor in a custody determination, the trial court had discretion to weigh that factor based in part upon Child's age of less than fourteen years.[2] *See* I.C. § 31-14-13-2(3). The trial court's finding has support in the record, and we decline to second guess the weight placed by the court's upon Child's wishes.

---

[2]Child was not yet ten years old at the time of the trial court's order awarding Father custody.

[35]     As to Finding 9, Mother contends that the portion of the finding that states, "Mother disparages Father in the presence of [Child]," Appellant's App'x at 23, is without evidentiary support in the record.  The entirety of the finding states:

> Sadly, this child believes that he has the ability to make a choice as to whether or not to spend time with Father.  [Child] believes that he is in charge.  The Court believes this to be a result of mother's destructive behavior and influence. *Mother disparages Father in the presence of [Child].*  Mother allows [Child] to choose when he will see his Father.  Mother makes it incredibly difficult for Father to be involved in the minor child's life.

Appellant's App'x at 22-23 (emphasis added).

[36]     We agree with Mother that there is no evidence in the record establishing what Mother says to Child.  The single sentence Mother challenges, however, is of little weight compared to the remainder of Finding 9, which finds ample support in the record.  Such evidence includes Demange's testimony concerning Mother's statements that she would do nothing to encourage a relationship between Child and Father, which Demange testified were "flabbergast[ing]" to her in light of her experience practicing family law.  Supportive evidence also includes Father's testimony concerning Mother's obstruction of Father's access to information about Child's education and extracurricular activities, and Demange's testimony concerning Mother's promises to Child that she would come get him if he wanted to leave Father's home during parenting time.

[37]     Mother's communications with Demange discussed the idea that Child "wants to come home and should be able to."  Ex. 3.  Mother also stated that she refused to allow Father to see child for Father's Day "[b]ecause he is crying

hysterically that he doesnt [sic] want to go and im [sic] not forcing him to go back to your prison." Ex. 6. All this occurred despite the court-ordered nature of the parenting time, and Mother repeatedly warned that she would involve the police if Father was slightly late in picking up or dropping off Child from activities. Ex. 3. Mother's communications with Father were repeatedly obstructive, as evidenced by her refusal to treat anything other than an extremely specific request for parenting time as a proper request. Ex. 10.

[38] We accordingly find evidence in the record to support the substance of Finding 9. Mother's arguments otherwise are, again, efforts to persuade us to impermissibly reweigh evidence.

[39] Mother also challenges Finding 10, which states that Mother scheduled activities for Child during designated parenting time without first consulting Father, and that Mother "refused to allow Father parenting time for the entire summer" in 2014. Appellant's App'x at 23. Mother's argument as to the first part of the finding is that Father's schedule as a cook was busy and unpredictable; that is true, except for a long period of time during which Father was out of work due to an injury.

[40] As to refusal of parenting time for the entire summer, after the third week of summer 2014, Father did not receive responses from Mother to his open-ended questions about parenting time. It was only when Father made a very specific request for parenting time—naming a particular day and particular timeframe— that Mother responded. Mother stated plainly: "'When can I see my son' is

not the appropriate way to request specific visitation time." Ex. 10. And even after permitting Father to see Child, Mother again threatened police involvement: "I need to have documentation for the police to file yet another police report when you decide to break our agreed upon visitation schedule yet again." Ex. 10.

[41] In all of this, Mother consistently refused to permit Father to have overnight custody of Child, despite a provisional parenting time order calling for just such custody. Whether "the entire summer" or "significant parts" of the summer are at issue, the import is the same: the evidence supports the trial court's multiple conclusions that Mother repeatedly interfered with Father's efforts to exercise court-ordered parenting time. Again, we find no error.

[42] Mother also challenges Finding 11, which found that Mother "justifies her conduct by raising allegations of emotional and physical abuse." Appellant's App'x at 23. Mother draws our attention to testimony from Father and Demange regarding Father's sometimes rough interactions with Child when Child would cry "uncontrollably where he can barely breathe at that point in time." Tr. at 261. Father acknowledged that he called Child "a little girl" at times in order to calm Child down, and that "[s]ometimes [Child] sucks it up and stops crying so we can actually have a conversation." Tr. at 261. Mother contends that this happened in more than one instance—indeed, she argues that the record "was saturated with evidence establishing this was not an isolated occurrence." Appellant's Br. at 20.

[43] We note that Mother quotes statements from the transcript "since he was six or seven" removed from context and, importantly, without direct citation to the record. Appellant's Br. at 20. We remind the parties that it is incumbent upon them to provide direct citations to the record, and that issues upon appeal may be waived when they would otherwise force this Court to "sift through a record to locate error." *Wright v. Elston*, 701 N.E.2d 1227, 1231 (Ind. Ct. App. 1998), *trans. denied*; Ind. Appellate Rule 46(A)(8)(a). While Mother finds fault in Father's admission to having reevaluated his approach to parenting Child, the trial court apparently viewed this favorably. And, importantly, the trial court expressly rejected Mother's oft-repeated contentions of abuse: "The Court does not find Mother's allegations of ongoing emotional and physical abuse to be credible." Appellant's App'x at 23.

[44] We will not reweigh the court's decision or reassess its credibility determinations. We find no error in Finding 11.

[45] Finally, Mother challenges the correctness of Finding 15, which took notice of Mother's statements during the hearing on August 14, 2014 that she might move closer to her employment and that this might necessitate Child changing schools. Mother observes that her testimony to this effect did not indicate a firm plan to move.

[46] Mother is correct as to the specific substance of her testimony. But her observation that she twice previously filed notices of intent to relocate—neither of which she followed through on—does little to reinforce her point. Moreover,

the trial court viewed Mother's tentative plans to relocate in the broader context of Father's relationship with Child, namely, that changing custody would necessitate a change in schools in any case. Simply put, the trial court gave little weight to the question of Child's integration into his existing school environment, particularly given its assessment of Mother's conduct vis-à-vis Father's parenting time rights. We will not second guess the court's decision on that point. We find no error in Finding 15.

## Conclusions in Light of the Findings

[47] We turn now to Mother's contention that the trial court's judgment was unsupported by the findings. Mother's argument centers on the premise that any misconduct on her part was isolated and did not place Child at risk, and that the trial court's award of custody to Father amounts to punishment of Mother.

[48] Where there is an existing custody order, it may not be modified "unless modification is in the child's best interests and a substantial change has occurred." *In re Paternity M.P.M.W.*, 908 N.E.2d 1205, 1208 (Ind. Ct. App. 2009). Here, no such prior custody order existed. Nevertheless, we observe that, "[g]enerally, cooperation or lack thereof is not appropriate grounds for switching custody." *Id.* Were a court to order that custody to be changed as a result of failure to cooperate with a custody order, "it would impermissibly punish a parent for noncompliance with a custody agreement." *Id.* This accords "with the supremacy of the child's interest in permanence and stability

over a parent's preferences." *Pierce v. Pierce*, 620 N.E.2d 726, 730 (Ind. Ct. App. 1993), *trans. denied*.

[49] In reaching its order giving Father legal and primary physical custody of Child, the trial court took note of and entered findings that Mother's conduct interfered with Father's exercise of parenting time. But the court also took note of the effect of Mother's conduct upon Child's relationship with Father, and expressly relied upon that consequence of Mother's conduct in its decision to grant custody to Father. Challenging this, Mother addresses individual findings in isolation, and treats the statutory factors as individual elements that dictate one or another outcome in the case. Simply put, Mother's argument asks that we reweigh evidence and reassess credibility. We decline to do so.

[50] The trial court's express basis in granting custody to Father was that it was in Child's best interest to restore a relationship with Father. The trial court concluded from Mother's conduct that this would not occur unless Father was granted primary physical and sole legal custody of Child. The findings—which we have concluded were not erroneous—support that conclusion.

## Cross-Appeal

[51] We turn now to Father's issue upon cross-appeal, whether, upon remand, the trial court may address his request for payment of his attorneys' fees.

[52] In paternity cases, trial courts may, in their discretion, order a party to pay a reasonable amounts for the costs of another party maintaining the paternity action and for attorney's fees. I.C. § 31-14-18-2(a). Father's petition to

establish paternity requests that Mother pay his attorney fees. **(Appellant's App'x at 26.)** During the evidentiary hearing on the petition, both parties presented testimony concerning their own attorneys' fees, as well as those fees associated with the work of Demange as Guardian ad Litem for Child. The trial court did not, in its findings and conclusion, enter an award of attorneys' fees or reapportion Guardian ad Litem fees for either party.

[53] Father did not, prior to the instant appeal, file a motion seeking clarification or an additional ruling on his request for attorneys' fees and reapportionment of Demange's fees as Guardian ad Litem. Father notes that, upon appeal, "[t]he Court on Appeal acquires jurisdiction on the date the Notice of Completion of Clerk's Record is noted in the Chronological Case Summary." App. R. 8. "Once an appeal has been perfected to the Court of Appeals or the Supreme Court, the trial court has no further jurisdiction to act upon the judgment appealed from until the appeal has been terminated." *Schumacher v. Radiomaha, Inc.*, 619 N.E.2d 271, 273 (Ind. 1993). "This rule facilitates the orderly presentation and disposition of appeals and prevents the confusing and awkward situation of having the trial and appellate courts simultaneously reviewing the correctness of the judgment." *Southwood v. Carlson*, 704 N.E.2d 163, 165 (Ind. Ct. App. 1999) (quotation marks omitted).

[54] Father contends that he was unable, as a result of Mother's appeal, to file a motion seeking the trial court's ruling on his requests for fees, because this Court had acquired jurisdiction before he filed a motion requesting a separate ruling. However, Father contends that because the trial court's order was silent

as to both his and mother's petition for fees, the matter should remain open for resolution by the trial court upon the conclusion of this appeal. Mother argues that by failing to properly advance this argument in his Appellee's brief, Father waived his appeal. Mother further argues that the trial court implicitly denied Father's request for attorneys' fees when it did not include in its order a finding that Father was entitled to payment of his fees under Section 31-14-18-2.

[55] With respect to omitted findings and conclusions, our Indiana Supreme Court has stated:

> In considering the sufficiency of the findings of fact and conclusions of law to sustain the decision, we recognize the general rule (a) that this court must accept ultimate facts as stated by the trial court if there is evidence to sustain them, and (b) that where facts necessary to sustain the issues are not found by the trial court and the findings are silent as to such facts, they are regarded as not proved. Under such circumstances the law, in effect, implies negative findings as to such issues against the party having the burden of their proof.

*Miller v. Ortman*, 235 Ind. 641, 665, 136 N.E.2d 17, 31 (1956) (footnotes omitted); *also McIntyre v. Guthrie*, 596 N.E.2d 979, 983 (Ind. Ct. App. 1992); *Rogers v. City of Evansville*, 437 N.E.2d 1019, 1026 (Ind. Ct. App. 1982).

[56] Here, the trial court did not enter findings or conclusions on Father's request for attorneys' fees. None of the facts decided in the custody and child support order had any relation to Father's request. The trial court was "silent as to such facts, [which] are regarded as not proved." *Id.* A negative judgment has been implied as a result, the effect of which is that the trial court determined that Father was not entitled to payment of attorneys' fees.

Father offers no argument as to the propriety *vel non* of that decision. He instead argues only that the issue is still open, while acknowledging that he failed to pursue any form of clarification of the court's order before this Court assumed exclusive jurisdiction over the case. Failure to provide cogent argumentation and citation to the record and relevant authorities results in waiver, and we conclude Father has waived that issue for our review. *See* App. R. 46(A)(8)(a) (requiring cogent argumentation with citations to the record and applicable law); *Pierce v. State*, Cause No. 78S05-1407-CR-460, Slip op. at 11 (Ind. May 12, 2015) ("[a] litigant who fails to support his arguments with appropriate citations to legal authority and record evidence waives those arguments for our review").

Accordingly, the question of attorneys' fees is not subject to consideration at the trial court upon conclusion of this appeal. Father has waived this Court's review of the merits of the trial court's implied denial of the request for attorneys' fees and Guardian ad Litem fees reapportionment.

# Conclusion

The trial court did not enter erroneous findings and conclusions, and it did not abuse its discretion when it granted Father custody of Child. The trial court's silence as to Father's request for attorneys' fees and Guardian ad Litem fees reapportionment amounted to denial of Father's request; Father's actions waived our review, and the matter is not open for adjudication before the trial court. We accordingly affirm the trial court's order in all respects.

Affirmed.

Riley, J., and Barnes, J., concur.