FILED

Mar 29 2023, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Amy O. Carson
Christopher P. Jeter
Jacob W. Zigenfus
Massillamany Jeter & Carson LLP
Fishers, Indiana

Gillian Keiffner
Keiffner Law
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Timothy R. Stoesz
Stoesz & Stoesz
Noblesville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: the Adoption of:
W.K., IV, and I.K.;

W.K.,
*Appellant,*

     v.

T.M.,
*Appellee.*

March 29, 2023

Court of Appeals Case No.
22A-AD-2227

Appeal from the Hamilton
Superior Court

The Honorable William J. Hughes,
Judge

Trial Court Cause Nos.
29D03-1904-AD-524
29D03-1904-AD-525

**Opinion by Judge Bailey**
Judges Brown and Weissmann concur.

**Bailey, Judge.**

# Case Summary

[1] W.K. ("Father") appeals the trial court's order granting custody of W.K., IV ("W.K.") and I.K. (collectively, "Children") to T.M. ("Stepfather"). We affirm.

# Issues

[2] Father raises three issues, which we consolidate and restate as the following two issues:

> I. Whether Father suffered harm from the trial court's denial of his motion to dismiss the petitions for adoption immediately following remand from this Court.

> II. Whether the trial court's findings and judgment are clearly erroneous.

# Facts and Procedural History

[3] Father and C.K. ("Mother") were married in March of 2008. W.K. was born to them on December 9, 2008, and I.K. was born to them on April 14, 2010. Mother and Father were in the military and lived with Children in Japan. In May of 2013, Father and Mother separated, and Father moved to Texas. Mother and Children remained in Japan until July of 2013, at which time the three of them moved to California and lived with Children's maternal grandparents.

[4] Mother filed for dissolution of marriage in California, and the dissolution was finalized in March of 2014. The dissolution order provided that the parents had joint legal custody of Children, Mother had physical custody of Children, and Father had parenting time with Children. Beginning in the summer of 2014, Children spent summers with Father in Texas. No child support order was issued at the time of the dissolution, but Father made some informal child support payments to Mother. Father was not "formally ordered to pay child support" until late in 2016. *In re Adoption of W.K.*, 163 N.E.3d 370, 372 (Ind. Ct. App. 2021), *trans. denied*.

[5] Mother began dating Stepfather, a police officer in Indiana. In the fall of 2014, Mother and Children moved to Indiana to live with Stepfather. Mother and Stepfather married in December of 2016, and, beginning in approximately September of 2017, maternal grandparents moved in with Mother, Stepfather, and Children in Indiana. In February of 2019, A.M. was born to Mother and Stepfather. When Mother gave birth to A.M., it was discovered that Mother had stage four stomach cancer. Mother died on March 28, 2019. Maternal grandparents continued to live with Stepfather and Children.

[6] On April 1, 2019, Father appeared at Children's home in Indiana to "pick up the children" to take them to Texas. Appealed Order at 4. That same day, maternal grandmother filed for emergency guardianship of Children, and Stepfather filed adoption petitions and an "Emergency Petition for Immediate Temporary Custody" of Children. Appellant's App. v. II at 60. On April 3, Father filed a petition to domesticate the California dissolution decree and a

motion to dismiss the adoption petitions. On April 10, the trial court held emergency hearings on the pending petitions. The court granted Father's petition to domesticate the California decree of dissolution. The court ordered temporary custody of Children to Stepfather for the remainder of the school year and then temporary custody to Father "until further Order of the Court." *Id*. at 67. Grandmother's guardianship petition was denied and dismissed. The trial court also appointed a Guardian Ad Litem ("GAL").

On July 26, 2019, Stepfather filed a "Petition for Emergency Hearing for Return of Child[ren] to Indiana" in which he alleged that Children's school in Indiana started on August 6 but Father had refused to return Children to Indiana. *Id*. at 104. The court set the matter for an emergency hearing on August 2 and granted Father's request to appear for the hearing telephonically. Following the August 2 hearing, the court ordered Father to return Children to Indiana on or before August 5, with Children to remain in Stepfather's "temporary custody until further order of the Court" and with Father to have parenting time with Children during fall school break. *W.K.*, 163 N.E.3d at 373.

Father did not return Children on August 5 as ordered; rather, he initiated an action in Texas to enforce the dissolution decree and attempted to enroll Children in school in Texas. Stepfather filed a report with the police in Indiana, and Father was charged with two counts of Level 6 felony interference with child custody. In September, Father was arrested in Texas, and Stepfather drove to Texas and brought Children back to Indiana. Stepfather subsequently

requested that the charges against Father be dropped, and the charges were dismissed with prejudice.

[9] On September 1, the GAL interviewed Children. Children reported to the GAL that Father "spanked" them repeatedly with his hand or a belt and that they were scared of Father. December 6, 2019, GAL report at 13.[1] W.K. reported that Father hits the belt "on tables to scare them" sometimes. *Id*. at 15. Children expressed their belief that Father was "angry all the time," and W.K. reported remembering an incident when Father "thr[ew] a computer at Mother in the face and ma[de] her nose bleed." *Id*. at 14. Children expressed fear "of what Father [would] do" if he discovered what Children told the GAL. *Id*. at 15. Children stated that they did not wish to live with Father. Children expressed happiness with Stepfather and a desire to live with Stepfather and visit Father during summers.

[10] On September 27, 2019, Father filed a "Renewed Motion to Dismiss" the adoption petitions. Appellant's App. v. II at 7. On December 17, 2019, and April 28, 2020, the trial court held a hearing on Stepfather's petition to adopt Children. Stepfather argued that Father's consent to adoption was not necessary, and the trial court agreed. Father appealed, and a panel of this Court reversed the trial court order. This Court held that Father's consent was

---

[1] The December 2019 GAL report was not included in the record on this appeal but was accessed by this Court on Odyssey, the state court case management system. We note that the report is part of the record in this case. *See* Ind. Appellate Rule 27.

required for the adoption of Children, in part because the evidence did not establish that Father was an "unfit" parent. *W.K.*, 163 N.E.3d at 375-76.

[11] Following remand and a change of trial court judge, on July 9, 2021, Father filed a "renewed motion" to dismiss the adoption petitions and a request for emergency custody of Children. Appellant's App. v. II at 172. On July 29, Stepfather filed a petition for custody of Children, citing Indiana Code Section 31-19-11-5. On August 2, the trial court conducted a hearing on Father's motion to dismiss the adoption petitions and denied it as "premature" because neither party had "rested its case" on all the issues raised in the adoption petitions and contest of adoption.[2] *Id.* at 186. Stepfather subsequently filed a motion to intervene as a party in the dissolution action, which the court denied as "unnecessary," and a request for custody as a de facto custodian of Children. *Id.* at 218. Father filed a motion for summary judgment on the issues of adoption and custody as a de facto custodian.

[12] On May 26, 2022, the trial court conducted a hearing on the adoption petitions and all pending custody matters. The court heard testimony from Father, Stepfather, and the GAL, among others. GAL reports from September 2021, January 2022, and May 2022 were admitted into evidence. Each GAL report noted that Children wish to live with Stepfather, with parenting time to Father.

---

[2] Father did not file a document entitled "Petition to Contest Adoptions" but the trial court found that Father's "filing of September 27, 2019[,] titled Motion to Dismiss, while poorly titled, was sufficiently explicit to advise the parties that … [Father] was contesting the adoption." Appellant's App. v. II at 224.

The GAL reports also indicated that Father had ceased physical discipline of Children, and one report noted, "It appears Father has displayed some growth in how he parents the Children, and is less reliant on utilizing fear as a tactic with the Children." Ex. at 112.

[13] On August 30, 2022, the trial court issued its Final Order on custody, which included findings of fact and conclusions thereon. Regarding adoption, the trial court noted that, per this Court's prior decision, Father's consent was required for the adoption of Children. Because Father did not consent, the court denied Stepfather's adoption petitions. Regarding custody, the trial court weighed the "best interests" of the children factors contained in Indiana Code Section 31-17-2-8 and the de facto custodian custody factors listed in Indiana Code Section 31-17-2-8.5.[3] The trial court granted sole legal custody and primary physical custody of Children to Stepfather and ordered parenting time for Father. This appeal ensued.

# Discussion and Decision

## Delay in Dismissing Adoption Petitions

[14] Father maintains that the trial court erred when it denied his July 9, 2021, motion to dismiss the adoption petitions as being "premature" because neither

---

[3] The trial court erroneously cited Indiana Code Section 31-14-13-8.5 rather than Indiana Code Section 31-17-2-8.5, but it applied the correct statute. Appealed Order at 16.

party had "rested its case" on all the issues raised in the adoption petitions and the contest of adoption. Appellant's App. v. II at 186. Although he acknowledges that the court dismissed the adoption petitions on August 30, 2022, he asserts that the court committed reversible error by delaying its ruling until that time.

[15] Indiana law requires that, "[w]henever a motion to contest an adoption is filed, the court shall, before entering a decree under IC 31-19-11, set the matter for a hearing to contest the adoption." Ind. Code § 31-19-10-5. After "hearing evidence at the hearing," the court "shall" dismiss the adoption petition if it finds that "a required consent has not been obtained." I.C. § 31-19-10-6(2)(A)(ii).

[16] Here, on December 17, 2019, and April 28, 2020, the trial court held a hearing on the issue of whether Father's consent was required for Stepfather's adoption of the children. The trial court concluded from that hearing that Father's consent to the adoptions was not required. On appeal of that order, a panel of this Court reversed. Thus, at the time the trial court "[r]eopened" this case after it had received the Court of Appeals' decision, it was clear that an evidentiary hearing on consent had been held and that Father's consent was required but not given. Appellant's App. v. II at 15. Therefore, under Indiana Code Section 31-19-10-6(2)(A)(ii), the trial court was required to dismiss the adoption petitions. The trial court did so in its order of August 30, 2022.

[17] Father asserts that the trial court waited too long to dismiss the adoption petitions. However, he cites to no legal authority imposing a time limit for the dismissal, and we find none. Moreover, even assuming for the sake of argument only that the trial court erred by waiting until August of 2022 to dismiss the adoption petitions, Father has failed to show that he suffered any harm from that delay. *See* Ind. Trial R. 61 (providing no error in any ruling or order is grounds for reversal on appeal unless the error was "inconsistent with substantial justice" and "affect[ed] the substantial rights of the parties").

[18] Indiana law clearly requires that, after an adoption petition is dismissed, the trial court "shall determine the person who should have custody of the child." I.C. § 31-19-11-5(a). It is also clear that Stepfather had "temporary custody [of Children] until further order of the court," i.e., pending a final custody decision. August 2, 2019, order of the trial court.[4] The latter order was still in effect at the time Father sought dismissal of the adoption petitions following remand from this Court. Thus, even if the trial court had immediately granted Father's July 2021 request to dismiss the adoption petitions, Stepfather still would have had temporary custody of the children pending the final custody determination that was issued on August 30, 2022.

[19] Father has failed to cite any legal authority for his assertion that the trial court should have immediately granted his motion on remand to dismiss the adoption

---

[4] Neither party provided a copy of the August 2, 2019, court order in their appendices on appeal. However, the order was accessible via Odyssey.

petitions, and he has failed to show any harm from the delay in dismissing those petitions.

## Custody Determination

[20] Father appeals the custody determination. Our standard of review in custody matters is well-settled: custody "determinations are within the trial court's discretion and will not be disturbed except for an abuse of discretion." *Blasius v. Wilhoff*, 863 N.E.2d 1223, 1229 (Ind. Ct. App. 2007), *trans. denied*. In determining whether the court abused its discretion, "[w]e will consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment, and we will not reweigh the evidence nor will we reassess the credibility of witnesses." *Matter of Guardianship of I.R.*, 77 N.E.3d 810, 813 (Ind. Ct. App. 2017).

[21] In addition, where there are findings of fact and conclusions thereon, as there are here,

> we first determine whether the evidence supports the findings and then whether findings support the judgment. On appeal we shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. A judgment is also clearly erroneous when the trial court applies the wrong legal standard to properly found facts.

*K.I. ex rel J.I. v. J.H.*, 903 N.E.2d 453, 457 (Ind. 2009) (quotations and citations omitted).

[22]  As Father notes, in a custody dispute between a third party and a natural parent, there is a presumption that custody with the natural parent is in a child's best interest.  *See, e.g.*, *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002).  To overcome this presumption and place a child "in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement."  *Id*.  That is, the trial court "must be convinced placement with a person other than the natural parent represents a substantial and significant advantage to the child."  *Id*.  The burden of proof is on the third party, and, if the third party meets that burden, "then custody of the child remains in the third party. Otherwise, custody must be modified in favor of the child's natural parent."  *K.I.*, 903 N.E.2d at 461.

[23]  In making the custody determination between a natural parent and a third party, the trial court may be guided by the "three step approach" outlined in *Hendrickson v. Binkley*, 316 N.E.2d 376, 380 (Ind. Ct. App. 1974) (*abrogation on other grounds recognized by Riggs v. Riggs*, 77 N.E.3d 792, 795 (Ind. Ct. App. 2017), *trans. denied*):

> First, it is presumed it will be in the best interests of the child to be placed in the custody of the natural parent.  Secondly, to rebut this presumption it must be shown by the attacking party that there is, (a) unfitness, (b) long acquiescence, or (c) voluntary relinquishment such that the affections of the child and third

party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. The third step is that upon a showing of one of these above three factors, then it will be in the best interests of the child to be placed with the third party.

*B.H.,* 770 N.E.2d at 286 (quoting *Hendrickson*).

[24] Father asserts that the trial court erred because it did not base its custody determination on the standard articulated in *Hendrickson*, above. However, our Supreme Court has made it clear that the trial court is not limited to the *Hendrickson* three-step approach when making its determination. *Id*. at 288. Rather, in determining the best interest of the child, the trial court must also consider the relevant statutory custody factors. In this case, those factors can be found at Indiana Code Section 31-17-2-8 and include:[5]

(1) The age and sex of the child.

(2) The wishes of the child's parent or parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

---

[5] Indiana Code Section 31-17-2-8 relates to initial custody determinations, and Indiana Code Section 31-17-2-21 relates to modification of custody determinations. As the trial court noted, our Supreme Court has held that "the distinctions between the statutory factors required to obtain initial custody and those required for a subsequent custody modification are not significant enough to justify substantially different approaches in resolving custody disputes. Instead[,] both require a determination of the child's best interest, and both require consideration of certain relevant factors." *K.I.*, 903 N.E.2d at 460.

(4) The interaction and interrelationship of the child with:

 (A) the child's parent or parents;

 (B) the child's sibling; and

 (C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

 (A) home;

 (B) school; and

 (C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 8.5(b) of this chapter.

(9) A designation in a power of attorney of:

 (A) the child's parent; or

 (B) a person found to be a de facto custodian of the child.

[25]    The trial court did not abuse its discretion or clearly err in its findings applying the above statutory custody standard. The trial court noted that Children were thirteen and twelve years old, and both consistently expressed strong wishes to remain in the custody of Stepfather, with parenting time to Father. As to Children's relationship with Father, the court noted the GAL testimony and report from December 6, 2019, in which the GAL stated Children were in fear of Father's temper and uncomfortable with some of his behaviors such as drinking alcohol and hitting Children with a belt as punishment. However, the GAL's more recent reports noted that Father had ceased using physical punishment on Children.

[26]    On the other hand, the court noted Children had strong, close relationships with Stepfather; their little sister, A.M.; and their maternal grandmother, all of whom lived with them in Indiana. Children had been living with Stepfather since they were four and three years old. During that time, Stepfather provided for Children financially and was a "constant presence in their lives[,] … encourage[ing] them in their school work and extracurricular activities." Appealed Order at 11. Children are "able to talk to [Stepfather] and share their concerns and worries with him." *Id*. In contrast, Children did not believe they could share their feelings with Father, including their fear of physical punishment and retaliation for reporting such punishment and their feelings about Mother and her death.

[27]    Maternal grandmother was also a "constant presence in the children's lives," and Children described her as "an integral part of their lives." *Id*. at 12. And

the GAL described Children's relationship with A.M. as "close, supportive, and loving." *Id.* Both Children wished to live with A.M. and maternal grandmother at Stepfather's home in Indiana.

[28] The trial court also found that Children were very well adjusted to their home, school, and community in Westfield, Indiana. Children did well in school, had friends and "good social skills," and engaged in extracurricular activities. *Id.* Children were also in "good mental" and physical health, despite their grief over their Mother's death. *Id.* at 13. Stepfather also appeared to be "well adjusted." *Id.*

[29] The trial court found that it had "very little information to form an opinion of Father's mental health or physical health," but noted he was "described to the GAL by others as being angry, aggressive, and impulsive." *Id.* at 14. The court also noted that Father "appears to have little regard for or understanding of the impact" of involving Children in the custody proceedings and "frequently discussed issues about the case with them." *Id.* The court found that Father's relationship with Mother involved domestic violence and Father's second marriage was also described by his second wife as "violent." *Id.* at 15.

[30] Given the above evidence, the trial court found that the best interests of the children factors contained in the custody statute weighed in favor of granting custody to Stepfather and parenting time to Father. The court found,

> based on the evidence before it and the actions of the litigants, [Children] will significantly benefit from a closer relationship with those important to them, Sister, Stepfather, Maternal

[Grandparents]…, Father, their friends, and fellow church members which is demonstrably more likely to be fostered by an award of custody to Stepfather. This is a significant advantage that cannot be duplicated in Father's custody.

*Id*. at 21.

[31] The court held that the presumption in favor of Father "has been rebutted by the clear and convincing evidence." *Id*. at 19. In reaching that conclusion, the trial court noted:

> [a]fter watching Father and listening to him and reviewing all the evidence presented[,] this Court simply cannot find Father to be credible. He presents one conveniently rosey [sic] view of his circumstances and life in Texas that is not what is seen by the GAL at her visit, it is not supported by the statements of his own sons, it is not reflected in his actions in this cause of action, and it is not supported by his own collateral contacts who[,] instead of describing him as a good a[nd] loving father[,] describe him as violent and aggressive. On the other hand, the Court does find the Stepfather to be credible.

*Id*. at 20.

[32] Those findings were supported by clear and convincing evidence, and the trial court's judgment was supported by those findings.[6] Father's contentions to the

---

[6] The trial court also found that Stepfather and Maternal Grandmother were de facto custodians of Children and applied the de facto custodian factors outlined in Indiana Code Section 31-17-2-8.5. However, the evidence does not support that finding. The court noted that Maternal Grandmother, "on occasion," had cared for Children for "several months." Appealed Order at 15-16. The court found that Stepfather had cared for Children "for a period of approximately 6 weeks prior to initiation of this action" and consistently

contrary are requests that we reweigh the evidence and judge witness credibility, which we may not do. *See I.R.*, 77 N.E.3d at 813.

## Conclusion

[33] Even assuming, without deciding, that the trial court erred in delaying dismissal of the adoption petitions, such error was harmless and not a basis for reversal. Further, the trial court's relevant custody findings were supported by clear and convincing evidence, and those findings support the final custody determination.

[34] Affirmed.

Brown, J., and Weissmann, J., concur.

---

since the action. *Id*. at 16. However, a de facto custodian is defined, in relevant part, as "a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least: … one (1) year if the child is at least three (3) years of age." I.C. § 31-9-2-35.5. The one-year period does not include "[a]ny period after a child custody proceeding has been commenced[.]" *Id*. The evidence cited by the trial court does not support a finding that Maternal Grandmother or Stepfather were de facto custodians as they had not been the "primary caregiver" for children for at least one year, exclusive of the period following initiation of custody proceedings. However, we note that this error was harmless, as application of the relevant custody factors cited above support the trial court's custody determination.